******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

RICHARD TATOIAN, TRUSTEE *v.* BRUCE D.
TYLER ET AL.
(AC 40736)

Sheldon, Keller and Moll, Js.*

*Syllabus*

The plaintiff trustee of a trust brought this action to recover damages from
the defendant beneficiaries of the trust, B and J, for common-law and
statutory (§ 52-568) vexatious litigation in connection with a prior action
that J and other beneficiaries had commenced against the trustee and
in which B had filed a cross complaint against the trustee. In that prior
action, B and J had claimed that the trustee improperly failed to provide
them with certain accountings of the trust before the death of the settlor,
R. Judgment was rendered in favor of the trustee on the operative
complaint of J and cross complaint of B after the partial granting of a
motion for summary judgment and a jury verdict. Thereafter, the trustee
brought this action, claiming that all of the counts against him in the
prior action were terminated by way of summary judgment or resolved
by the jury in his favor. The trial court found that the trustee had
conceded that his action would fail if he did not to prove one of his
vexatious litigation claims as to one of the claims by B and J in the
prior action. The court rendered judgment in favor of B and J after it
determined that the trustee had failed to prove that they lacked probable
cause, as required under the common law and under § 52-568 (1), to
sue him for failure to provide them with accountings, and had failed to
prove that B and J had acted with malice, as required under § 52-568
(2). The trustee thereafter filed a motion for reargument and reconsidera-
tion in which he claimed, inter alia, that the trial court had stated
mistakenly in its memorandum of decision that he had conceded that
his action would fail if he could not prove that B and J lacked probable
cause to bring all of the counts in the prior action. The trial court granted
the motion for reargument and reconsideration and rendered judgment
for the trustee on his claim under § 52-568 (1), and rendered judgment
for B and J as to the trustee's claims under the common law and § 52-
568 (2). B and J then appealed and the trustee cross appealed to this
court. B and J claimed, inter alia, that the trial court lacked subject
matter jurisdiction over the trustee's causes of action and improperly
failed to consider whether R had been subjected to undue influence in
connection with the creation of the trust. The trustee, on cross appeal,
claimed, inter alia, that the trial court should have concluded that all
of the claims at issue were vexatious in nature and, thus, rendered
judgment in his favor with respect to those claims. *Held*:

1. The trial court properly denied B's motion to dismiss the trustee's action,
in which B claimed that the court lacked subject matter jurisdiction
due to the trustee's lack of standing at the time he commenced the
action: although the trust document did not specifically authorize the
trustee to commence a vexatious litigation action, the trustee had a
specific interest in the claims he brought against B and J in his capacity
as trustee, and a common-law duty to take reasonable steps to recoup
assets of the trust, including attorney's fees and costs incurred as a
result of the prior action, within a reasonable time frame during the
winding up of the trust after R's death, as the trustee' actions were a
reasonably necessary part of the winding up process, and no provision
of the trust specifically abrogated the trustee's fundamental duty to
pursue claims and recoup assets on behalf of the trust, including claims
against beneficiaries; moreover, B and J provided no support for their
claim that the trustee lacked authority to pursue his claims because the
trust's beneficiaries had standing to pursue a claim against their fellow
beneficiaries for damages related to the prior action, as the trustee had
a fiduciary duty to act on behalf of the trust and not to defer to decisions
made by beneficiaries, and B and J provided no authority to support
the proposition that the trustee lacked the authority to carry out his
duties as trustee during the winding up period without first seeking the
approval of one or more beneficiaries of the trust.

2. B and J could not prevail on their claim that the trial court improperly failed to consider whether R was subjected to undue influence in connection with the creation of the trust; there was no indication that the court ignored or failed to consider evidence of undue influence, although the court did not expressly address the issue of undue influence in its factual findings, it plainly found that R was advised of and satisfied with the contents of the trust, and the court was not obligated to resolve the issue of undue influence because the question before it was whether J had probable cause in the prior action to claim that the trust should be modified on the ground of undue influence, and whether B and J, in relying on their claim of undue influence, had probable cause to bring their claims against the trustee.

3. This court found unavailing the claim by B and J that the trial court misinterpreted relevant law in its analysis of whether they had probable cause in the prior action to claim that the trustee had failed to diversify the trust's assets in violation of statute (§ 45a-541c); the claim by B and J rested on the faulty premise, which this court rejected, that the trial court failed to consider whether R was subjected to undue influence in connection with the creation of the trust, as the trial court plainly found that R had been advised of the contents of the trust and was satisfied with them.

4. B and J could not prevail on their claim that the trial court misinterpreted relevant law in its analysis of whether the trustee could prevail merely by demonstrating that B and J lacked probable cause to bring one of the several claims against him in the prior action; contrary to the assertion by B and J that the trustee's claims merely presented different theories of recovery that arose from his conduct in the prior action in failing to diversify the trust's assets, the court properly applied the law and concluded that the claim of failure to diversify trust assets was logically severable from the remaining claims for which probable cause existed, as the failure to diversify claim was not based on the identical factual allegations as the remaining claims, the allegations in each claim related to facts that differed in terms of times, occurrences and actions, and each of the claims at issue amounted to separate and distinct charges to which the trustee was required to respond.

5. The trial court did not properly analyze whether B and J had probable cause to bring certain of their claims against the trustee in the prior action, as the court essentially disallowed any reliance by the trustee on the trust's exculpatory clause to demonstrate that B and J lacked probable cause: although the exculpatory clause did not cloak the trustee with immunity from suit, the clause was highly relevant to an analysis of whether probable cause existed to bring the claims at issue against the trustee in that it represented a significant hurdle for B and J to overcome in order to demonstrate that the trustee was liable for the damages that they sought in the prior action, and, therefore, the trial could should have considered whether B and J reasonably believed that they could overcome the exculpatory clause and whether they reasonably believed that they were able to prove that R had been subjected to undue influence; moreover, because B was an attorney at the time he filed his cross complaint, the court had to resolve the issue of whether a reasonable attorney would have believed that B had probable cause to bring the claims in the cross complaint, and with respect to J, the court had to determine whether the facts known to J at the time he brought the claims against the trustee in the prior action were sufficient to give rise to a bona fide belief that he should entertain the action against the trustee; accordingly, the judgment could not stand with respect to the trustee's claims under § 52-568 (1) that alleged that B and J lacked probable cause in the prior action to bring certain claims in various counts of the complaint and cross complaint.

Argued December 3, 2018—officially released October 29, 2019

*Procedural History*

Action to recover damages for, inter alia, vexatious litigation, and for relief, brought to the Superior Court in the judicial district of Tolland, where the defendants filed a counterclaim; thereafter, the court, *Graham, J.*, granted the plaintiff's motion to dismiss the counterclaim; subsequently, the court, *Sferrazza, J.*, granted

in part the plaintiff's motion for summary judgment and denied the defendants' motion for summary judgment; thereafter, the court, *Cobb, J.*, denied the motion to dismiss filed by the named defendant; subsequently, the matter was tried to the court, *Cobb., J.*; judgment for the defendants; thereafter, the court granted the plaintiff's motion for reargument and reconsideration, and rendered judgment in part for the plaintiff, from which the defendants appealed and the plaintiff cross appealed to this court. *Reversed in part*; *further proceedings*.

*Bruce D. Tyler*, self-represented, and *Jay M. Tyler*, self-represented, the appellants-cross appellees (defendants).

*Bruce S. Beck*, for the appellee-cross-appellant (plaintiff).

*Opinion*

KELLER, J. The plaintiff, Richard Tatoian, in his capacity as trustee of the Ruth B. Tyler Irrevocable Trust, brought the underlying vexatious litigation action against the defendants, Bruce D. Tyler (Bruce Tyler) and Jay M. Tyler (Jay Tyler). The defendants are among the beneficiaries of the trust. In 2010, Jay Tyler commenced an action (prior action) against, among others, the plaintiff and Bruce Tyler. Jay Tyler named the plaintiff as a defendant in all seven counts of his complaint, but counts three through seven of the complaint were brought against the plaintiff exclusively. Essentially, with respect to the plaintiff, Jay Tyler alleged in his complaint that, in a variety of ways, the plaintiff had performed deficiently as trustee and sought money damages and equitable relief. In 2011, Bruce Tyler brought a cross complaint in the prior action. All four counts of the cross complaint, which was brought against the plaintiff exclusively, are nearly identical to the claims raised in counts four through seven of the complaint. Bruce Tyler sought, inter alia, money damages. After the plaintiff prevailed in the prior action, he commenced the present action, sounding in common-law and statutory vexatious litigation, for, inter alia, attorney's fees and costs he incurred, on behalf of the trust, in defending himself in the prior action. Following a court trial in the present action, the trial court found that the defendants lacked probable cause to bring one of the claims against the plaintiff in the prior action. Accordingly, the court rendered judgment in part in the plaintiff's favor and awarded him a portion of the attorney's fees and costs he incurred in defending the prior action.

The defendants appeal from the judgment of the trial court and raise the following claims: (1) the court lacked subject matter jurisdiction over the plaintiff's causes of action because he lacked standing at the time of the commencement of the present action; (2) the court improperly failed to consider whether the settlor of the trust, Ruth B. Tyler (Ruth Tyler), was subjected to undue influence in connection with the creation of the trust; (3) the court misinterpreted relevant law in its analysis of whether, in the prior action, the defendants had probable cause to claim that the plaintiff had violated General Statutes § 45a-541c by failing to diversify trust assets; and (4) the court misinterpreted relevant law in its analysis of whether the plaintiff could prevail in the present action merely by demonstrating that the defendants lacked probable cause to bring one of the claims that they brought against him in the prior action.

The plaintiff cross appeals from the judgment of the trial court. He claims that, although the court properly concluded that one of the claims raised against him by the defendants in the prior action was not supported

by probable cause, the court erroneously failed to conclude that the defendants lacked probable cause to bring the remaining claims and had acted with malice in bringing the claims.[1]

We disagree with the claims raised in the defendants' appeal but agree, in part, with the claim raised in the plaintiff's cross appeal. Accordingly, we affirm in part and reverse in part the judgment of the trial court.

I

FACTS AND PROCEDURAL HISTORY

In its initial memorandum of decision, the court found the following facts, many of which are not in dispute: "The defendants, [Jay Tyler] and [Bruce Tyler], are the sons of the late [Ruth Tyler]. The defendants . . . have three brothers; Thomas J. Tyler [(Thomas Tyler)], Russell J. Tyler [(Russell Tyler)], and John E. Tyler, Jr. [(John Tyler, Jr.)].

"Bruce Tyler and Thomas Tyler are attorneys licensed to practice in this state.

"In 1984, [Bruce Tyler] represented his mother, Ruth Tyler, in executing a will that stated that the Tyler child with the lowest net worth would receive enough money from her estate to equalize that child's net worth with that of the sibling with the second lowest net worth. [Bruce Tyler] gave Ruth Tyler the original of the 1984 will and he kept a copy for his records. [Bruce Tyler] did not tell his siblings about the 1984 will or provide them with a copy because he understood that as her attorney he had an obligation not to disclose such information without her consent.

"Under the 1984 will, [Jay Tyler], the youngest of Ruth Tyler's five sons, would have received the entirety of Ruth Tyler's estate. [Jay Tyler] first learned about the 1984 will from [Bruce Tyler] after Ruth Tyler died in 2010.

"In 1988, Ruth Tyler and her husband, John Tyler, the defendants' father, executed new wills in which they divided their assets equally among their five sons. This 1988 will was also prepared by [Bruce Tyler], who was present when the will was executed and took the oaths. [Bruce Tyler] did not tell Jay Tyler that their parents had changed the will to leave their estate to their five children equally. At trial, [Bruce Tyler] claimed that he did not recall preparing the 1988 will for his parents.

"In 1990, Ruth and John Tyler took out a loan on the family home in order to loan Jay Tyler $50,000. [Bruce Tyler] assisted his parents in obtaining the bank loan. Under his agreement with his parents, [Jay Tyler] was required to pay back the loan in full with interest and to make monthly payments to his parents.

"In 1991, [Bruce Tyler] borrowed $25,000 from his

parents to use for college tuition. He, too, was required to pay back this loan with interest. [Bruce Tyler] repaid his parents at least $10,000 on this loan.

"John Tyler, Ruth Tyler's husband, died in 1997.

"In 1999, Ruth Tyler executed a new will with the assistance of her son, Thomas Tyler. Under this will, Ruth's five sons would share equally in her estate; however, any outstanding loan amounts owed to her would be deducted from that child's share of the estate and redistributed to the others. At that time, she [granted] her son [John Tyler, Jr.] her power of attorney.

"[Bruce Tyler] could not recall if his mother told him about the 1999 will. [Jay Tyler] was not aware of the 1999 will until after his mother died.

"On August 3, 2004, the plaintiff received a call from Thomas Tyler notifying him that his mother, Ruth Tyler, would be calling him to discuss estate planning. The next day, Ruth Tyler called the plaintiff, and they met on August 10, 2004. The plaintiff is an attorney who has practiced in Enfield for forty years in the area of trusts, wills, and estates. He had known Ruth Tyler for fifty years, as their families were neighbors.

"At their meeting on August 10, 2004, Ruth Tyler explained that she had prepared a will in 1999, which she wished to maintain. She also told the plaintiff that she wanted to create a trust to preserve her assets in the event she went into a nursing home. They also discussed the execution of a living will and revised power of attorney, again designating her son, [John Tyler, Jr.]. The plaintiff met with [John Tyler, Jr.], who held Ruth Tyler's power of attorney, and he gave the plaintiff a copy of the 1999 will.

"The plaintiff prepared the trust based on Ruth Tyler's instructions and explained its contents to her in detail. In order to accomplish Ruth Tyler's purpose to preserve her assets and avoid probate, the trust was irrevocable. The plaintiff was made the trustee of the trust. Ruth Tyler agreed to the trust provisions.

"The trust adopted the provisions of the 1999 will, and provided that Ruth Tyler's five sons would share equally in her estate, 'subject to the direction that any sums due and owing to the [g]rantor [Ruth Tyler] by her sons [Bruce Tyler and Jay Tyler], shall be deducted from any share which they are to receive' under the trust.

"According to the trust, the trustee had 'full power and authority to manage and control the trust estate,' which included the right to invest and reinvest the trust assets. 'The trustees may make and change such investments from time to time according to their discretion; and they may continue to hold any stocks, securities or other property received by them hereunder, without any duty of diversification.' During his time as trustee,

the plaintiff had discussions with an investment advisor but decided not to make any trades or any changes to the investments of the trust assets.

"Under the section [of the trust entitled '(t)rustee (a)ccountings'], the trust provides: 'The [t]rustee shall render an account at least once each twelve months to each adult beneficiary . . . . The account shall show the receipts, disbursements and distributions of principal and income since the last accounting, and the assets on hand. If no objection shall be made to any account so rendered within ninety (90) days after a copy thereof has been deposited in the mail addressed to any person entitled thereto, as hereinabove provided, such beneficiary shall be conclusively presumed to have approved or assented to all actions reflected in the account so rendered.' Prior to Ruth Tyler's death, the plaintiff only sent accountings to Ruth Tyler and [John Tyler, Jr.].

"The trust identifies Ruth Tyler as grantor and refers to her as grantor throughout the trust. Although the trust includes some limited definitions, it does not define the term 'beneficiary.'

"The trust contains an incontestability of trust clause, which provides that 'if any beneficiary' under the trust shall contest the validity of the trust, they shall not be entitled to any benefit under the trust.

"The trust also provides a provision entitled 'Exculpation of Individual Trustees' that provides: 'No individual trustee shall be liable [for] any mistake or error of judgment, or for any action taken or omitted, either by the trustee or by any agent or attorney employed by the trustee, or for any loss or depreciation in value of the trust, except in the case of willful misconduct.'

"After the trust was executed, Ruth Tyler's assets were transferred to the trust. The assets included Bank of America stock held by Smith Barney as the investment advisor. The Bank of America stock had been owned by Ruth and John Tyler for many years. At year end in 2006, the trust estate had a value of just under $500,000, with $362,504 attributed to stocks. At some point, Ruth Tyler sold her home and those cash proceeds were added to the trust, making the value of the trust approximately $500,000.

"Neither defendant Bruce Tyler [nor] Jay Tyler [was] aware that their mother created the trust until after her death in 2010; however, both were aware that she had wanted to do so.

"Ruth Tyler died on April 1, 2010.

"The plaintiff liquidated the assets of the trust and converted them to cash for distributions to the beneficiaries. He also prepared accountings, which he filed with the Probate Court, and provided to the defendants. At that time, the value of the trust assets had decreased substantially to approximately $270,000, with the stock

value having decreased to approximately $146,000 from its high several years before of $362,504.

"After Ruth Tyler's death, Bruce Tyler told Jay Tyler . . . about the trust, and Bruce Tyler told Jay Tyler about the 1984 will. When [Jay Tyler], who is not a lawyer, learned about the trust, he had concerns that the plaintiff had kept the trust a secret and should have been providing him accountings during his mother's lifetime. Although [Jay Tyler] disputed that he owed his mother any money, he was also concerned that his mother's trust essentially disinherited him, which he did not believe she would do, leading him to believe that she had been influenced by Thomas Tyler. Jay Tyler believed that the plaintiff had conspired with Thomas Tyler and that they had unduly influenced Ruth Tyler to 'cheat' him out of his inheritance. Jay Tyler claimed that Thomas Tyler was not a nice person and enjoyed 'putting Jay down,' and [that] the fact that Thomas Tyler was aware of the trust and will, was a 'red flag.' Also, when Jay Tyler learned from Bruce Tyler that the trust had decreased substantially in value, he was concerned that the plaintiff had not complied with prudent investor rules, which he learned about from Bruce Tyler.

"[Jay Tyler] decided that he wanted to bring a lawsuit for the purpose of seeking to have the 1984 will deemed operative, and pursuant to which he would benefit substantially. He asked his brother Bruce Tyler for assistance. At first, Bruce Tyler declined and told Jay Tyler to contact an attorney. When he spoke to Bruce Tyler a second time and again sought his assistance, Bruce Tyler agreed to help Jay Tyler with the paperwork. Bruce Tyler told Jay Tyler that he was not his attorney and that he was acting on his own.

"With Bruce Tyler's assistance, Jay Tyler prepared a complaint against all of his brothers, including Bruce Tyler, who were the other beneficiaries of the trust and heirs under the 1999 will, and the plaintiff as trustee. The suit was served on or about December 23, 2010, and was filed in [the judicial district of Fairfield at Bridgeport] on January 28, 2011. . . .

"[Jay Tyler's] initial complaint alleged that the plaintiff had conspired [with Thomas Tyler] to keep the trust and the 1999 will a secret from him, that as a result of this conspiracy, Jay Tyler was wrongfully deprived of his share of Ruth Tyler's estate, and that the plaintiff had a duty to communicate with Jay Tyler and to furnish him annual accounts of the trust during Ruth Tyler's lifetime and failed to do so. He also made claims of undue influence against Thomas Tyler.

"[Bruce Tyler] admitted all of the allegations of Jay Tyler's complaint and filed a cross complaint against the plaintiff, dated March 21, 2011. In that complaint, Bruce Tyler asserted that the plaintiff had a duty to provide him with accountings for the trust during Ruth

Tyler's lifetime, and that the plaintiff had violated General Statutes § 45a-541, because he failed to act as a 'prudent investor' in investing and managing the assets of the trust. Bruce Tyler also alleged that the plaintiff failed to diversify the investments of the trust in violation of the same statute, and that his failure to provide accountings to Bruce Tyler during Ruth Tyler's lifetime deprived him of his right to seek an order from the Probate Court to compel the plaintiff not to maintain the securities he had received in the trust, which right was claimed to be afforded by General Statutes § 45a-204.

"On October 11, 2011, Bruce Tyler amended his cross complaint, with the court's permission, to proceed against the plaintiff's investment adviser and his employer, alleging that they were liable because the plaintiff had relied on their advice and management of the securities in the trust account. On February 7, 2012, Bruce Tyler's cross complaint against the investment adviser and his employer was dismissed for lack of standing.

"On April 10, 2012, [Bruce Tyler] amended his cross complaint against the plaintiff to add an additional claim alleging that the plaintiff should have sued an investment advisor who had provided advice seeking to recover the lost value of stocks owned by the trust and that the plaintiff was therefore liable to Bruce Tyler.

"On June 21, 2012, [Jay Tyler] amended his complaint adding all of the additional claims against the plaintiff that had been previously made by Bruce Tyler in his cross complaint against the plaintiff.[2]

"Judgment entered in favor of the plaintiff on Jay Tyler and Bruce Tyler's operative complaints after the partial granting of summary judgment and a jury verdict.[3]

"To defend the claims against him in the [prior] action, the plaintiff, on behalf of the trust, hired counsel and has incurred attorney's fees in the amount of $114,889 and costs in the amount of $2111.82." (Footnotes added and footnotes omitted.)

In support of his vexatious litigation claims in the present action, the plaintiff, in his capacity as trustee, relied on the claims brought against him in the prior action in both the operative complaint brought by Jay Tyler and the operative cross complaint brought by Bruce Tyler. The plaintiff also alleged that all of the counts brought against him either were terminated by way of summary judgment or resolved by a jury in his favor. The plaintiff alleged that "[a]lthough . . . [Bruce Tyler] was named as a defendant in the complaint and in the amended complaint [brought by Jay Tyler], in reality . . . [Bruce Tyler] and . . . Jay Tyler were not adversaries but were, in fact, acting in concert. Moreover, in addition to filing his cross complaint and the

amendments thereto . . . [Bruce Tyler] directed and controlled the initiation of the action, including preparing and arranging for service of the complaint and all other relevant pleadings filed by . . . [Jay Tyler] as were necessary for the commencement and prosecution of the action.''

In count one, the plaintiff asserted a cause of action sounding in common-law vexatious litigation, seeking compensatory and punitive damages. The plaintiff alleged in relevant part: ''The action, including the complaint and cross complaint, was brought and prosecuted by the defendants without probable cause in that the defendants lacked knowledge of the facts, actual or apparent, strong enough to justify a reasonable belief that they had lawful grounds to bring and prosecute the causes of action alleged against the plaintiff.'' The plaintiff alleged that ''[i]n bringing and prosecuting the [prior] action, [the] defendants acted with malice based on one or more of the following: [a] [the] defendants lacked probable cause to bring and prosecute the action; [b] the action was brought and prosecuted primarily for an improper purpose; [c] the defendants knew or reasonably should have known that they had no valid claim against the plaintiff based on the facts asserted in the complaint, amended complaint, cross complaint and amended cross complaint and/or that any claims made by the defendants against the plaintiff would have been barred by the provisions of the trust or the laws of the state of Connecticut.'' The plaintiff alleged that ''[t]he aforesaid actions on the part of the defendants were taken with a malicious intent unjustly to vex, annoy and harass the plaintiff'' and ''constitute vexatious litigation under Connecticut common law.'' The plaintiff alleged that he had incurred attorney's fees and costs in defending the prior action and bringing the present action.

In count two, the plaintiff, relying on the allegations set forth in count one, asserted a claim of statutory vexatious litigation, seeking double damages pursuant to General Statutes § 52-568 (1).[4]

In count three, the plaintiff, also relying on allegations set forth in count one, asserted a claim for statutory vexatious litigation, seeking treble damages pursuant to § 52-568 (2).[5]

The defendants separately filed answers and special defenses in which they denied the allegations that the complaint and the cross complaint had been brought without probable cause, that they had acted with malice in bringing and prosecuting the prior action, and that their actions had constituted vexatious litigation under the common law or § 52-568.[6] The respective pleadings filed by the defendants mirrored one another. First, the defendants claimed that, in bringing the prior action against the plaintiff, they lacked the requisite intent to have engaged in vexatious litigation. Second, the

defendants claimed that the plaintiff commenced the present action prior to the termination of the prior action, thus depriving the court of subject matter jurisdiction over the plaintiff's action. Third, the defendants claimed that the plaintiff lacked the authority under the trust to bring the present action. Fourth, the defendants claimed the present action reflected the plaintiff's improper motivation in that, rather than acting in the best interest of the trust, he is motivated by his own malice and vindictiveness toward the defendants and not by any acts of the defendants. Fifth, the defendants claimed that in the present action the plaintiff had violated General Statutes § 52-226a by failing to obtain a certificate from the court in the prior action confirming that the action was vexatious in nature.[7] Sixth, the defendants claimed that the plaintiff had engaged in fraud. In his replies to the special defenses filed by the defendants, the plaintiff denied each and every allegation raised therein. Later, the court granted the plaintiff's motion for summary judgment with respect to the second, third, and fifth special defenses raised by the defendants. At trial, the defendants expressly abandoned the first and fourth special defenses.

After the court, *Cobb, J.*, denied a motion filed by Bruce Tyler to dismiss the plaintiff's vexatious litigation action,[8] a trial took place over the course of three days in May, 2016. Thereafter, the parties submitted posttrial briefs. On December 7, 2016, the court set forth its ruling in a thorough memorandum of decision.

Having set forth its findings of fact, which we previously have recited in this opinion, the court addressed the merits of the plaintiff's claims in relevant part as follows: "The cause of action for vexatious litigation permits a party who has been wrongly sued to recover damages. . . . In Connecticut, the cause of action for vexatious litigation exists both at common law and pursuant to statute. Both the common-law and statutory causes of action [require] proof that a civil action has been prosecuted . . . . Additionally, to establish a claim for vexatious litigation at common law, one must prove want of probable cause, malice and a termination of suit in the plaintiff's favor. . . . The statutory cause of action for vexatious litigation exists under § 52-568, and differs from a common-law action only in that a finding of malice is not an essential element, but will serve as a basis for higher damages. . . . In either type of action, however, [t]he existence of probable cause is an absolute protection against an action for malicious prosecution, and what facts, and whether particular facts, constitute probable cause is always a question of law. . . .

"The court concludes that the . . . commencement of the [prior] action against the plaintiff [by Jay Tyler], and [the] . . . cross complaint against the plaintiff [by Bruce Tyler], satisfies the first element that they prose-

cuted actions against the plaintiff. The court also finds that the [prior] action terminated in the plaintiff's favor, either by summary judgment or a jury verdict in the plaintiff's favor. Thus, the court must determine the remaining elements; whether the [prior] action was prosecuted without probable cause and with malice.

"The plaintiff conceded at argument that if he fails to prove his vexatious litigation claim as to one of the defendants' claims in the [prior] action, this action fails. As explained below, the court finds that the plaintiff has failed to prove the defendants' claim [in the prior action]—that the plaintiff failed to provide them with accountings—lacked probable cause, or that it was brought with malice. Because the court finds [that] probable cause existed for this claim, it is not necessary to address the other causes of action brought by the defendants in the [prior] action. Similarly, because the court finds the issues for the defendants, it is unnecessary for the court to address the defendants' remaining special defense [that was based on fraud]." (Citations omitted; internal quotation marks omitted.)

After discussing legal principles related to probable cause and observing that its existence in a particular case is a question of law, the court stated: "The plaintiff claims that count four of [Jay Tyler's] operative complaint and count one of [Bruce Tyler's] cross complaint alleging that the plaintiff improperly failed to provide them with accountings under the trust, lacked probable cause. In support of this claim, the plaintiff argues that this claim was disposed of in the plaintiff's favor on summary judgment and that the language of the trust is clear and did not require that accountings be provided to the defendants. The court disagrees and finds that the defendants had probable cause to bring these claims.

"First, adverse rulings in the underlying case on summary judgment or otherwise do not equate to a lack of probable cause. . . .

"Additionally, the court has reviewed the trust and concludes that it is not 'so clear,' as the plaintiff contends, such that any layperson would understand it to allow for only one interpretation. There is only one 'Trustee Accounting' provision in the trust, § 8 (h), which provides in part that: '*The [t]rustee shall render an account at least once each twelve months to each adult beneficiary and to the natural or legal guardians, if any, of each minor or otherwise legally disabled beneficiary then receiving or entitled to receive income hereunder*. The account shall show the receipts, disbursements and distributions of principal and income since the last accounting, and the assets on hand. If no objection shall be made to any account so rendered within ninety (90) days after a copy thereof has been deposited in the mail addressed to any person entitled thereto, as hereinabove provided, such beneficiary shall be conclusively presumed to have approved or assented

to all actions reflected in the account so rendered.' " (Emphasis added.)

"The plaintiff provided accountings under this clause to Ruth Tyler during her lifetime and [John Tyler, Jr.], her power of attorney. The plaintiff did not provide accountings of the trust holdings to the defendants or other heirs. The plaintiff claims that the language of this accountings provision 'clearly' required him to provide accountings only to 'income' beneficiaries and that Ruth Tyler was the only income beneficiary. Although the court agrees that this is a valid interpretation of the clause, it disagrees that it is the only possible interpretation.

"The plaintiff's argument is dependent upon the court finding that there is only one interpretation of the first sentence of the accountings provision finding that the last phrase of the first sentence, 'entitled to receive income hereunder,' modifies 'adult beneficiary,' at the beginning of the sentence. The court finds, however, that there is another possible reading of this sentence, and that is that the phrase 'entitled to receive income hereunder' modifies the category of recipients identified immediately before it, that is, 'natural or legal guardians, if any, of each minor or otherwise legally disabled beneficiary.' Thus, the court finds that the provision is ambiguous, allowing for more than one interpretation.

"If the phrase 'entitled to receive income hereunder' does not modify 'adult beneficiary,' then there is an argument that adult beneficiaries were entitled to accountings under the trust. The term beneficiary is not defined in the trust. The common definition of beneficiary is 'the person designated to receive the income of a trust estate.' . . . Thus, under the common understanding of the word beneficiary, the defendants as recipients of property under the trust are beneficiaries, and there can be no claim that they are not adults.

"Moreover the trust identifies Ruth Tyler only as 'the [g]rantor,' and not as a beneficiary, although she was entitled to receive payments under the trust. When the term 'beneficiary' is used throughout the trust, it appears to mean Ruth Tyler's heirs, and the defendants are identified as heirs. For example, § 5 (f) of the trust allows certain payments to minors or incapacitated '[b]eneficiaries,' and § 5 (m) provides that the '[t]rustees shall not be liable to the [g]rantor, any beneficiary, or . . .' suggesting that the words have different meanings in the trust. The accounting provision requires [accountings] to 'adult beneficiar[ies]' but does not require accountings to the '[g]rantor,' although the grantor received accountings. The trust could have been drafted to include [a] definition section that would have made its provisions clearer.

"Thus, the court disagrees that the accountings

clause of the trust is 'so clear' as to have only one meaning. The court finds that it is susceptible to more than one interpretation, one of which supports the defendants' claim in the [prior] action that, as adult beneficiaries under the trust, they were entitled to accountings. Thus, the court finds that there was a reasonable basis for the defendants' belief that they were beneficiaries under the trust and, as such, were entitled to receive accountings from the plaintiff. The plaintiff did not provide the defendants with accountings during Ruth Tyler's lifetime. Had the plaintiff done so, the defendants would have known that the trust was declining significantly in value. Thus, the court finds [that] there was probable cause for the defendants to bring their claim against the plaintiff for failing to provide accountings to them under the trust.

"In addition, the plaintiff has not established that the so-called '[e]xculpation [c]lause' in the trust, drafted by the plaintiff to protect the plaintiff, is sufficient to establish that the defendants lacked probable cause to bring this claim in the [prior] action. Under the trust, the trustee shall not be subject to any liability, 'except in the case of willful misconduct.' The plaintiff argues that: 'The meaning of this language is clear to a layperson, and certainly is clear to an attorney—that in order to have a claim against the plaintiff, the defendants must allege, and moreover establish, that the plaintiff engaged in wilful misconduct.' The plaintiff claims that the defendants failed to plead 'wilful [misconduct]' or prove it at trial. The plaintiff misconstrues the probable cause standard, which does not require talismanic phrases in pleadings or that a defendant prevail at trial. . . . This 'exculpation' language in the trust does not prohibit the bringing of an action against the trustee, but only that he 'shall not be liable,' except for 'willful [misconduct].' Indeed, the clause was asserted by the plaintiff in the [prior] action as a special defense.

"Thus, the court finds that the plaintiff has failed to prove that the defendants lacked probable cause to sue the plaintiff for failure to provide them with accountings. . . .

"As for the element of malice, the court finds that the plaintiff has not proved this element, either. In a vexatious suit action, the defendant is said to have acted with 'malice' if he acted primarily for an improper purpose; that is, for a purpose other than that of securing the proper adjudication of the claim on which [the proceedings] are based . . . . [W]hile malice may be inferred from the lack of probable cause, the lack of probable cause may not be inferred from malice. . . .

"The plaintiff's primary argument is that he has proved malice by proving lack of probable cause. Because the court has found probable cause, the plaintiff cannot prevail on this argument.

"The plaintiff also refers to circumstantial evidence of the defendants' animosity toward the other siblings as proof of malice against the plaintiff, but the plaintiff has produced no evidence that the defendants held animosity toward him. The court is not aware of any cases, and the plaintiff has provided none, that allow the court to transfer the animosity of the defendants from one party to another. Thus, [t]he evidence relied on by the plaintiff fails to establish that the defendant[s] acted primarily for any purpose other than securing an adjudication of its claim." (Citations omitted; footnotes omitted.) The court rendered judgment in the defendants' favor.

On December 23, 2016, the plaintiff filed a motion seeking articulation and clarification of the court's December 7, 2016 decision. Specifically, the plaintiff asked the court to provide additional explanation for its conclusion that the defendants had probable cause to bring an action for *monetary damages* against the plaintiff. On December 23, 2016, the plaintiff also filed a motion seeking reargument and/or reconsideration of the court's December 7, 2016 decision, with a supporting memorandum of law. In relevant part, the plaintiff argued that the court had stated mistakenly in its decision that he had conceded that his action would fail if he could not prove that the defendants lacked probable cause to bring *all* of the counts in the prior action, that relevant precedent did not require him to prove that there was a lack of probable cause with respect to all of the counts in the prior action, that the court erred in finding that the defendants had probable cause to bring the accounting claims, and that, with respect to the remaining claims in the prior action, he had proven that the defendants acted with a lack of probable cause and malice. Bruce Tyler replied to the motion seeking reargument and/or reconsideration, arguing that the relief sought therein was unwarranted. On February 15, 2017, the court held a hearing on the motion. Following the hearing, the parties submitted supplemental briefs.

On July 19, 2017, the court issued a memorandum of decision in which it granted the plaintiff's motion for reconsideration and/or reargument. The court left the findings of fact set forth in its original decision undisturbed but set forth a different analysis with respect to the claims raised. In relevant part the court stated: "The plaintiff asserts that the court improperly concluded that the defendants had probable cause to bring their accounting claims in the underlying action. The plaintiff does not challenge the court's conclusion that the accountings provision in the trust is ambiguous, but instead contends that the defendants lacked probable cause to bring their accounting claim because the claim was barred by the trust's exculpatory clause. This clause, contained within § 5 (l) of the trust, provides: 'No individual [t]rustee shall be liable for any mistake

or error of judgment, or for any action taken or omitted, either by the [t]rustee or by any agent or attorney employed by the [t]rustee, or for any loss or depreciation in the value of the trust, except in the case of willful misconduct.' In its original decision, the court determined that the exculpatory clause did not defeat the defendants' probable cause to bring the accounting claim because it did not prohibit the bringing of an action against the trustee, but that he shall not be liable, except for wilful misconduct. Consequently, the plaintiff has not contended that the court overlooked controlling authority or misapplied the facts. Instead, the plaintiff simply reiterates the argument made in his posttrial brief that has been adequately addressed by the court's memorandum.''

As we discussed in footnote 2 of this opinion, Jay Tyler generally alleged in counts one and two of his amended complaint, which was directed at the plaintiff as well as Thomas Tyler, Russell Tyler, John Tyler, Jr., and Bruce Tyler, that the plaintiff had been a participant in a conspiracy to wrongfully deprive him of his rightful share of Ruth Tyler's estate. The court in the present action concluded that, to the extent that it was necessary to consider whether Jay Tyler had probable cause to bring these claims, it could consider them to be part of the claims raised by Jay Tyler that were based on the plaintiff's failure to provide the defendants with trust accountings. Apparently referring to counts one and two of the complaint, in which Jay Tyler claimed that a conspiracy existed, the court explained: "[T]he court does not consider these contentions because there are not sufficient factual allegations directed at the plaintiff therein to constitute a separate claim against him and to the extent that this claim contains allegations against him, they go to his failure to provide an accounting.'' Accordingly, the court's analysis of "accounting claims'' encompassed the claims brought against the plaintiff in counts one, two, three, and six of Jay Tyler's amended complaint.[9] In this appeal, the defendants do not raise a claim of error with respect to the court's decision to interpret counts one, two, three, and six of the complaint in the manner that it did.

The court went on to state: "In addition to the discussion in its original memorandum, the court notes that the exculpatory clause does not act as a complete bar or immunity to civil suit, as the plaintiff's argument seems to suggest. . . . The language of the clause limits the trustee's liability [to harm] resulting from the trustee's wilful misconduct. This action is a vexatious litigation suit initiated by the trustee against the defendants, who are beneficiaries of the trust, a situation not covered by the exculpatory clause. In this case, the plaintiff has the burden to prove a lack of probable cause, among other things. The probable cause standard applied in vexatious litigation actions imposes a significant burden on the plaintiff. That the exculpatory clause

may act as a shield to protect a trustee from personal liability where his conduct did not constitute wilful misconduct does [not] mean that the exculpatory clause may be used as a sword by the trustee to establish probable cause in a vexatious suit. There is no language . . . in the exculpatory clause to require such an interpretation, and the plaintiff has presented no case, and this court is not aware of any, that necessitates such a finding. Indeed, the remedy imposed by the trust when beneficiaries contest the trust is that they may not benefit from the trust assets." (Citation omitted.)

Next, the court considered the plaintiff's contention that in its original decision it mistakenly relied on what it believed to have been a concession by the plaintiff that, if probable cause existed with respect to one of the claims in the prior action, he would be unable to prevail in the present action. The court stated in relevant part: "The court agrees that the plaintiff did not concede this issue, and that a plaintiff in a vexatious litigation action need not show a lack of probable cause on all of the claims asserted in the underlying action in order to prevail on a vexatious litigation claim, especially where the claims are logically severable. . . . The court agrees with the plaintiff and therefore now considers, on the merits, whether the defendants' other . . . claims against the plaintiff in the [prior] action were vexatious." (Citation omitted.)

After discussing relevant legal principles concerning probable cause and malice, the court addressed the other claims that the defendants brought against the plaintiff in the prior action. The court stated in relevant part: "In the [prior] action, the defendants brought a claim alleging that the plaintiff failed to comply with the requirements of diversification as set forth in § 45a-541c, which provides: 'A trustee shall diversify the investments of the trust unless the trustee reasonably determines that, because of special circumstances, the purposes of the trust are better served without diversifying.' The plaintiff argues that the trust clearly states that he had no duty to diversify. The defendants argue that they had probable cause to bring this claim because § 45a-541c imposes a duty to diversify. The court agrees with the plaintiff that under the statutory scheme and the trust, he had no duty to diversify.

"The duty imposed by § 45a-541c is part of a larger statutory scheme entitled, the 'Connecticut Uniform Prudent Investor Act,' which is a set of individual duties imposed by General Statutes §§ 45a-541 to 45a-541*l*. The applicability of the duties imposed by the Connecticut Uniform Prudent Investor Act, including the duty to diversify in § 45a-541c, is determined pursuant to General Statutes § 45a-541a, which provides: '(a) Except as provided in subsection (b) of this section, a trustee who invests and manages trust assets owes a duty to the beneficiaries of the trust to comply with the prudent

investor rule, as set forth in sections 45a-541 to 45a-541*l*, inclusive. (b) The prudent investor rule is a default rule that may be expanded, restricted, eliminated or otherwise altered by provisions of the trust. A trustee is not liable to a beneficiary to the extent that the trustee acted in reasonable reliance on provisions of the trust.' The language of these statutory provisions is clear and unambiguous.

"Under § 5 (a) of the trust, the plaintiff had no duty to diversify based on the following provision stating that the trustee 'may continue to hold any stocks, securities or other property received by them . . . *without any duty of diversification.*' (Emphasis added.) In light of the clear and unambiguous language of the trust and § 45a-541c, the plaintiff did not have a duty to diversify the trust's holdings, and the defendants lacked probable cause to bring this claim. . . . As for the malice requirement, the court affirms and adopts its finding in its original memorandum that the plaintiff has not established malice. . . .

"Consequently, the court concludes that the plaintiff has proven that the defendants lacked probable cause to bring their [claim in the prior action] alleging that the plaintiff failed to diversify the assets of the trust and that the plaintiff has failed to prove that the defendants brought this claim with malice." (Citations omitted.)

The court proceeded to address another claim that the defendants brought against the plaintiff in the prior action: "The defendants also alleged in the [prior] action that the plaintiff failed to act as a prudent investor and, as a result, the assets of the trust severely depreciated by more than $250,000. Specifically, the defendants alleged in the [prior] action that the depreciation of the trust securities was a result of the plaintiff's violation of General Statutes § 45a-541b (a), which provides: 'A trustee shall invest and manage trust assets as a prudent investor would, by considering the purposes, terms, distribution requirements and other circumstances of the trust. In satisfying this standard, the trustee shall exercise reasonable care, skill and caution.' The defendants further alleged that the plaintiff failed to act as a prudent investor in managing the assets of the trust as prescribed by § 45a-541b (b) and (c).[10]

"As to this claim, the plaintiff relies primarily on the exculpatory clause in the trust, which the court has rejected.

"The plaintiff also asserts that General Statutes § 45a-204 provides him immunity from any claim relating to the depreciation of the securities. Section 45a-204 provides in relevant part: 'Trust funds received by . . . trustees . . . may be kept invested in the securities received by them, unless it is otherwise ordered by the Court of Probate or unless the instrument under which such trust was created directs that a change of invest-

ments shall be made, *and the fiduciaries thereof shall not be liable for any loss that may occur by depreciation of such securities.*' . . .

"The evidence reveals that neither the probate court nor the trust instructed the plaintiff to change the initial investments. Accordingly, the plaintiff, as trustee, was subject to two somewhat conflicting statutory mandates. On one hand, pursuant to § 45a-541b, the plaintiff had a duty to the beneficiaries to maintain and invest the securities as a prudent investor would utilizing reasonable care. On the other hand, pursuant to § 45a-204, the plaintiff was able to maintain the securities as he received them without subjecting himself to any potential liability.

"The plaintiff argues that § 45a-204 provides him immunity from all liability notwithstanding the duty imposed by § 45a-541b. Even though the language of § 45a-204 appears to be applicable in the present case, our Supreme Court, applying substantially identical statutes, has held that the immunity provided by § 45a-204 is not absolute, but applies 'so long as in the *exercise of reasonable prudence* [the trustee] deem[s] it unnecessary to make any change.' . . . *Peck* v. *Searle*, 117 Conn. 573, 582, 169 A. 602 (1933); see *Beardsley* v. *Bridgeport Protestant Orphan Asylum*, 76 Conn. 560, 564, 57 A. 165 (1904) (same); *Bassett* v. *City Bank & Trust Co.*, 115 Conn. 1, 26, 160 A. 60 (1932) (holding that right to maintain securities as they were received 'must be exercised with prudence and the trustee will not be allowed to escape the responsibilities attaching to trustees generally for the safety of trust funds in his control').

"Although this reasonableness standard is not evident from the language of the current and previous versions of the statutes, it has been imposed by these Supreme Court decisions. The reasonableness standard utilized by these cases plainly mirrors the duty imposed by § 45a-541b, in that 'the trustee shall exercise reasonable care, skill and caution' in managing the trust assets. Accordingly, the defendants' claim that the plaintiff is not absolutely precluded by the immunity of § 45a-204, is not baseless because it is supported by Supreme Court precedent. Even if the defendants lost on that claim in the underlying action and even if it may be considered novel, [t]he standard for determining probable cause is not whether there are adverse rulings by the court or whether the claim is ultimately determined to be without merit. . . . Therefore, the defendants would have had probable cause to bring this claim if they were aware of facts to support their contention that it was unreasonable for the plaintiff to retain the investments as he received them.

"In the present case, the court found in its original memorandum of decision that the accountings prepared by the plaintiff revealed that the trust securities had

substantially depreciated by more than $250,000. The accountings also revealed that the plaintiff had not taken any action to slow or stop the loss of value in the securities. Based on these facts and the duty imposed on the plaintiff by § 45a-541b, the court concludes that the plaintiff failed to prove that the defendants lacked probable cause to pursue this claim. In view of the court's finding on probable cause as to this claim, the court need not decide [the issue of] malice." (Citation omitted; emphasis in original; footnote in original and footnote omitted.)

Last, the court turned to the defendants' claim in the prior action that the plaintiff failed to hold the investment advisor liable. The court stated in relevant part: "In the underlying action, the defendants asserted that the plaintiff failed to pursue an action against the investment advisor who provided him advice and counseled him not to diversify the assets of the trust, which was contrary to the best interests of the beneficiaries of the trust and resulted in substantial depreciation of the trust assets. The defendants relied upon § 45a-541i, which provides generally that a trustee may delegate investment and management functions to an agent, who can be held liable for a breach of duty imposed by such delegation. The plaintiff argues that immunity bars this claim and that there was no evidentiary basis for this claim because the trust provided him authority to decide whether or not to pursue claims against the investment advisor. The plaintiff also asserts that he testified that he did not delegate the authority to manage any securities and [that] the defendants failed to proffer expert testimony in support of their claim.

"In determining whether the defendants had probable cause for their claims, the issue is whether the defendants had the bona fide belief in the existence of the essential facts underlying the claim. . . . The court finds that under the circumstances presented here, the defendants did have a bona fide belief in the existence of the essential facts.

"The plaintiff's claim that the investment advisor is entitled to immunity pursuant to § 45a-204 and the trust's exculpatory clause [is] undermined by General Statutes § 45a-541i (b), which provides that '[a]n attempted exoneration of the [financial advisor to whom investment and management functions have been delegated] from liability for failure to meet such a duty is contrary to public policy and void.'

"The plaintiff, as trustee, had the ability to bring a cause of action against the investment advisor pursuant to § 45a-541i. As the court found in its original memorandum of decision, the defendants brought this claim based upon the fact that the investment advisor counseled the plaintiff not to diversify the securities. The court further found that during his time as trustee, the plaintiff had discussions with an investment advisor but

decided not to make any trades or any changes to trust assets. The trust accountings reflected that no change had been made to the investments. Based upon the foregoing, the plaintiff has failed to prove that the defendants lacked probable cause to bring this claim and, therefore, no finding [with respect to the issue] of malice is necessary." (Citation omitted; footnote omitted.)

Thus, in its decision granting the plaintiff's motion for reargument and reconsideration, the court concluded that the plaintiff had sustained his burden of proving that the defendants lacked probable cause to bring the failure to diversify claim, but that he had failed to prove that the defendants had acted with malice with respect to that claim. With respect to the claim based on the plaintiff's failure to provide the defendants with trust accountings, the court concluded that the plaintiff did not prove that the defendants had brought the claim without probable cause. Relying on its finding concerning malice in its original memorandum of decision, the court affirmatively found that the plaintiff failed to prove that the defendants had brought the claim with malice. With respect to the remaining claims, the court concluded that the plaintiff failed to prove that the defendants brought the claims without probable cause, and the court stated that, in light of this determination, it was unnecessary to reach the issue of malice.

In its decision granting the plaintiff's motion for reargument and/or reconsideration, the court rendered judgment in the plaintiff's favor under count two, sounding in statutory vexatious litigation under § 52-568 (1), with respect to the failure to diversify claim. The court, relying on its finding that malice had not been proven, rendered judgment in the defendants' favor with respect to count one, sounding in common-law vexatious litigation, and count three, sounding in statutory vexatious litigation under § 52-568 (2). The court awarded the plaintiff $33,774 in attorney's fees and $527.96 in costs arising from the plaintiff's defense in the prior action and a prior appeal involving the parties. See *Tyler* v. *Tyler*, 151 Conn. App. 98, 93 A.3d 1179 (2014).[11]

After the court granted the plaintiff's motion for reargument and/or reconsideration and granted the plaintiff the relief described previously, the defendants filed a motion for reargument and/or reconsideration of that decision, as well as a memorandum of law. On August 2, 2017, the court denied the motion. The present appeal and cross appeal followed. Additional facts will be set forth as necessary.

## II

### DEFENDANTS' APPEAL

The defendants appeal from the judgment of the trial court and raise the following claims: (1) the court lacked subject matter jurisdiction over the plaintiff's causes of action because he lacked standing at the time

of the commencement of the lawsuit; (2) the court improperly failed to consider whether the settlor of the trust, Ruth Tyler, was subjected to undue influence in connection with the creation of the trust; (3) the court misinterpreted relevant law in its analysis of whether, in the prior action, they had probable cause to claim that he had violated § 45a-541c by failing to diversify trust assets; and (4) the court misinterpreted relevant law in its analysis of whether the plaintiff could prevail in the present action merely by demonstrating that the defendants lacked probable cause to bring one of the several claims that they brought against him in the prior action. We address these claims in turn.

A

First, the defendants claim that the court lacked subject matter jurisdiction over the plaintiff's causes of action because he lacked standing at the time of the commencement of the lawsuit. We disagree.

The following additional facts and procedural history are relevant to this claim. In September, 2015, Bruce Tyler filed a motion to dismiss the plaintiff's complaint and an accompanying memorandum of law on the ground that the plaintiff lacked standing and, therefore, the court lacked subject matter jurisdiction. In support of the motion to dismiss, Bruce Tyler referred to the undisputed facts that Ruth Tyler died on April 1, 2010, and the plaintiff, as trustee, commenced the present action more than three years later, in December, 2013. Bruce Tyler argued that, following Ruth Tyler's death, the plaintiff had standing only to wind up the trust, which did not encompass his commencement of the present action. The plaintiff objected to the motion. On November 17, 2015, the court denied the motion to dismiss. The court stated: "The plaintiff . . . has standing to bring this lawsuit, as he is a proper person to adjudicate the claims of vexatious suit in this case. *May* v. *Coffey*, 291 Conn. 106, 967 A.2d 495 (2009). The plaintiff has a specific personal interest in this case by virtue of his status as trustee, and as [trustee] his responsibility to wind up the affairs of the trust. *Ramondetta* v. *Amenta*, 97 Conn. App. 151, 903 A.2d 232 (2006)."

The defendants argue before this court that the trial court erroneously concluded that, following the termination of the trust, the plaintiff had the authority under the trust to bring the present action against them because it was done as part of the winding up of the trust. The defendants argue that although the court properly looked to *Ramondetta* for guidance with respect to the issue of whether the plaintiff had the authority to commence the present action, the court misapplied that precedent. Specifically, the defendants argue that bringing the present action was not part of the winding up process because the present action was not an "asset" of the trust, it had no "intrinsic value,"

and there was no provision in the trust that required the plaintiff to bring the present action against them.[12] The defendants argue that, far from being an act that the plaintiff was required to perform by the trust, or an act that was necessary to wind up the trust, bringing the present action was a voluntary "gamble" of trust assets that was undertaken by the plaintiff alone, and that one or more beneficiaries could have commenced the action if they believed it was worthwhile to do so.

As he did before the trial court, the plaintiff argues that his powers as trustee did not end immediately when the trust terminated upon Ruth Tyler's death, but that they continued for a reasonable time so that he could wind up the affairs of the trust. He argues that he timely commenced the present action in December, 2013, shortly after the trial in the prior action concluded in October, 2013, and the appeal period from the judgment rendered in his favor in that action had expired. When he brought the present action against the defendants, the plaintiff argues, he was working diligently and within a reasonable time to collect an asset of the trust. The plaintiff argues that the fact that the claims he brought against the defendants were valid and had value to the trust is evidenced by his obtaining a judgment in his favor on behalf of the trust. He argues: "It was well within the trustee's discretion (if not mandated by law as part of [the] plaintiff's duties) to pursue this claim as an asset of the trust."

"The issue of standing implicates subject matter jurisdiction and is therefore a basis for granting a motion to dismiss. . . . Because a determination regarding the trial court's subject matter jurisdiction raises a question of law, [the standard of] review is plenary. . . . Standing is established by showing that the party claiming it is authorized by statute to bring suit or is classically aggrieved. . . . The fundamental test for determining [classical] aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific, personal and legal interest in [the subject matter of the challenged action], as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the [challenged action]. . . . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Citations omitted; internal quotation marks omitted.) *Wilcox* v. *Webster Ins., Inc.*, 294 Conn. 206, 213–15, 982 A.2d 1053 (2009). "[I]t is the burden of the party who seeks the exercise of jurisdiction in his favor . . . clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." (Internal quotation marks omitted.) *McWeeny* v. *Hart-*

*ford*, 287 Conn. 56, 63–64, 946 A.2d 862 (2008).

Before the trial court and before this court, the parties have framed the issue of standing as being dependent on whether the plaintiff had the authority, in his representative capacity as trustee, to commence the vexatious litigation action following the termination of the trust upon Ruth Tyler's death. As the parties observe, § 4 of the trust provides in relevant part: "After provision has been made for the payments and reservations specified in Section 3 . . . [for debts and funeral expenses, estate administration expenses, and taxes], *upon the* [*g*]*rantor's death, the* [*t*]*rust shall terminate* and the principal thereof (including any accumulated income) shall be distributed, in substantially equal shares, to the [g]rantor's children . . . ." (Emphasis added.) Section 3 of the trust provides in relevant part that "[f]ollowing the death of [the] [g]rantor, the [t]rustees shall reserve and pay out of the assets otherwise passing under [s]ection 4 . . . ."

"One of the fundamental common-law duties of a trustee is to preserve and maintain trust assets. A trustee has the right and duty to safeguard, preserve, or protect the trust assets and the safety of the principal." (Footnotes omitted.) 76 Am. Jur. 2d, Trusts § 402 (2016). "A trustee *must enforce* and collect choses in action, *claims*, debts, and demands belonging to the estate. The trustee may also be charged with the value of assets which never came into its possession if it failed its duty to acquire them." (Emphasis added; footnote omitted.) Id., § 401. "The safety of the trust fund is the first care of the law, and on this depends every rule which has been made for the conduct of trustees. So a trustee *must take reasonable steps to enforce claims of the trust* and to defend claims against the trust." (Emphasis added; footnote omitted.) 90A C.J.S., Trusts § 327 (2010); see also 1 Restatement (Second), Trusts § 177, p. 383 (1959) ("[t]he trustee is under a duty to the beneficiary to take reasonable steps to realize on claims which he holds in trust"). "It is not the duty of the trustee to bring an action to enforce a claim which is a part of the trust property if it is reasonable not to bring such an action, owing to the probable expense involved in the action or to the probability that the action would be unsuccessful or that if successful the claim would be uncollectible owing to the insolvency of the defendant or otherwise." 1 Restatement (Second), supra, § 177, comment (c), p. 384. "The trustee is the proper party to bring an action against anyone who wrongfully interferes with the interests of the trust." *Naier* v. *Beckenstein*, 131 Conn. App. 638, 646, 27 A.3d 104, cert. denied, 303 Conn. 910, 32 A.3d 963 (2011).

In *Ramondetta*, this court carefully set forth principles related to a trustee's authority to wind up a trust following its termination: "The authorities are in agreement . . . that the fiduciary duty of a trustee does not

immediately terminate when the trust property ceases to exist. Rather, the trustee's fiduciary duty survives even the termination of the trust. See 4 A. Scott, Trusts (4th Ed. Fratcher 1989) § 344, p. 542 ('[w]hen the time for the termination of the trust has arrived, the duties and powers of the trustee do not immediately cease; until the trust is actually wound up, he has such duties and powers as are appropriate for the winding up of the trust'); 1A A. Scott, Trusts (4th Ed. Fratcher 1989) § 74.2, p. 435 (trustee still under duty to account to beneficiary and still owes fiduciary duties as 'fiduciary relation continues, although it ceases to be a relation with respect to any specific property'); 2 Restatement (Second), Trusts § 344, p. 190 (1959) ('[w]hen the time for the termination of the trust has arrived, the trustee has such powers and duties as are appropriate for the winding up of the trust').

"A trustee is permitted a reasonable time to wind up trust affairs. 'At such time when the trust is terminated in any way . . . the trust nevertheless continues for a reasonable time during which the trustee has power to perform such acts as are necessary to the winding up of the trust and the distribution of the trust property . . . . Determination of what constitutes a reasonable period within which to wind up the trust and distribute the trust assets will depend upon a number of facts with respect to the particular trust.' G. Bogert & G. Bogert, Trusts and Trustees (2d Ed. Rev.1983) § 1010, pp. 448–51; see also *Trust Created Under Will of Damon*, 76 Haw. 120, 126, 869 P.2d 1339 (1994) ('trust will undoubtedly continue for a substantial time after termination during the winding up period'); Uniform Trust Code § 816 (26) (trustee may 'on termination of the trust, exercise the powers appropriate to wind up the administration of the trust and distribute the trust property to the persons entitled to it'). What is reasonable in a particular case is a fact specific question. As one authority states: 'What constitutes a reasonable time depends on the circumstances. Under some circumstances there may be a considerable period elapsing before it is possible to complete the process of winding up the trust and to make a final distribution of the trust property.' 4 A. Scott, Trusts (4th Ed. Fratcher 1989) § 344, p. 545; accord 2 Restatement (Second), supra, § 344, comment (a), p. 191 ('period [for winding up the trust] may properly be longer or shorter, depending upon the circumstances')." (Footnotes omitted.) *Ramondetta* v. *Amenta*, supra, 97 Conn. App. 157–59.

The plaintiff, as trustee, had a specific interest in the claims brought against the defendants in the vexatious litigation action. The vexatious litigation action, which was commenced by the plaintiff in his capacity as trustee, was an attempt by him to recoup assets of the trust, specifically, attorney's fees and costs incurred by the trust as a result of the prior action. As the authorities

set forth previously in this opinion reflect, a trustee has a common-law duty to take reasonable steps to recoup trust assets, including bringing claims belonging to the trust within a reasonable time frame during the winding up period of a trust.[13] This fundamental duty to recoup assets made the plaintiff's actions a reasonably necessary part of the winding up of the trust. Indeed, in the present case, the plaintiff did, in fact, recoup assets on the trust's behalf in the form of attorney's fees and costs.

The defendants rely on the fact that the trust did not specifically authorize the plaintiff to commence a vexatious litigation action against one or more beneficiaries. Section 5 of the trust, which sets forth administrative and investment powers granted to the trustee, explicitly provides: "With respect to each trust estate herein created, the [t]rustees thereof shall have the following powers in addition to the powers otherwise granted by applicable state common law or statute." Certainly, no provision of the trust specifically abrogated the plaintiff's common-law duty to pursue claims and recoup assets on behalf of the trust, including claims against beneficiaries.[14]

Also, the defendants argue that the plaintiff lacked the authority to commence the present action during the winding up period of the trust because one or more trust beneficiaries could have commenced the present action and the plaintiff commenced the action without consulting with one or more trust beneficiaries. The defendants have not provided this court with any authority to support the conclusion that, during the winding up period, the plaintiff lacked the authority to pursue a claim to recoup trust assets simply because one or more trust beneficiaries had standing to pursue a claim against one or more of their fellow beneficiaries for damages related to the prior action. The plaintiff had a fiduciary duty to act on behalf of the trust, not to defer to decisions made by beneficiaries. Moreover, the defendants have not provided this court with any authority, nor cited any provision of the trust, to support the proposition that the plaintiff lacked the authority to carry out his duties as trustee during the winding up period without first seeking the approval of one or more beneficiaries of the trust.

For the foregoing reasons, we conclude that there was no reason for the trial court to have concluded that the plaintiff was acting without authority to commence the present action during the winding up period of the trust. The plaintiff's commencement of the action during the winding up period was reasonably necessary to fulfilling his duty of recouping trust assets within a reasonable time. Accordingly, we conclude that the court properly denied the defendants' motion to dismiss.

B

Next, we address the defendants' claim that the court improperly failed to consider whether the settlor of the trust, Ruth Tyler, was subjected to undue influence in connection with the creation of the trust. In summary fashion, the defendants argue: "The mental state of the trust settlor at the time the trust was created is relevant to the issue of probable cause. Yet, the court totally ignored the evidence of undue influence in connection with the creation of the trust." The defendants also argue: "It is reversible error for the [trial] court to ignore [their] claims of undue influence and their effect on the validity of the exculpatory provisions in the trust." We disagree.

Previously in this opinion, we discussed the claims raised by the defendants in the prior action. "In the first count of the complaint [in the prior action], Jay Tyler sought to modify the trust, claiming that Thomas Tyler had exerted undue influence upon Ruth Tyler in relation to the trust and had conspired together with John Tyler, Russell Tyler and [the plaintiff] to keep Ruth Tyler's trust and will a secret from him." *Tyler* v. *Tyler*, 163 Conn. App. 594, 599, 133 A.3d 934 (2016). Count one, which was brought by Jay Tyler, is the only count that was based on a claim of undue influence, and it was directed against Thomas Tyler, Russell Tyler, John Tyler, Jr., Bruce Tyler, and the plaintiff. In connection with that count, Jay Tyler alleged that the plaintiff was part of a conspiracy to keep his mother's will a secret from him, not that the plaintiff had unduly influenced her in connection with the creation of the trust.

Neither the claim raised by Jay Tyler in count one of his complaint nor the issue of undue influence were fully litigated in the prior action. As we stated in footnote 3 of this opinion, in August, 2013, the trial court, *Sommer*, *J.*, rendered summary judgment in favor of Thomas Tyler, Russell Tyler, John Tyler, Jr., and the plaintiff with respect to this claim but, in June, 2014, this court reversed the trial court's judgment with respect to count one of the complaint after concluding that a genuine issue of material fact existed with respect to the claim. *Tyler* v. *Tyler*, supra, 151 Conn. App. 104–109. In *Tyler* v. *Tyler*, supra, 163 Conn. App. 615–16, this court, however, determined, on the basis of its review of what had transpired during the jury trial in the prior action,[15] that, following the partial dismissal of the defendants' initial appeal in June, 2014, none of the defendants' claims against the plaintiff was still pending in the trial court. This court reasoned that "all of [the defendants'] claims against [the plaintiff] were either raised, instructed on and tried to verdict before the jury or abandoned, either by failing to raise and request instructions on them at trial or by not appealing from the trial court's failure or refusal to instruct upon them despite their request. In each such scenario, the [defendants'] failure to appeal from the judgment rendered

upon the jury's verdict established that all of their claims on which summary judgment was not rendered were finally resolved at or shortly after trial, either by the jury's general verdict or by the [defendants'] abandonment of them." Id. In January, 2015, Jay Tyler withdrew his complaint against Thomas Tyler, Russell Tyler, John Tyler, and Bruce Tyler.

With respect to the issue of undue influence, during the trial in the present action, Jay Tyler testified that, between 1999 and 2004, he visited his mother occasionally and did not notice anything about her behavior that led him to believe that she had been subjected to any type of undue influence. He testified that, following his mother's death, he learned of the 1999 will, as well as the 2004 trust, which incorporated the terms of the 1999 will. At this time, he began to question why his mother would have changed the estate plan that was reflected in her 1984 will, to his detriment. He stated that "[s]he would never have disinherited me knowingly, and that's what made me go down the road of looking into the prospects of undue influence and what might have happened here." He stated his belief that, when she executed the 1999 will and the 2004 trust, she would have wanted to maintain the estate plan that was reflected in the 1984 will, which was very favorable to him.

Jay Tyler testified that, following his mother's death but prior to bringing the claims in the prior action, he hired an attorney to help him gather information about what was going on with his mother's estate and that these efforts were not fruitful. He testified that he realized that he needed to bring a lawsuit to challenge the trust and, because he lacked the financial means to challenge the trust, he turned to his brother, Bruce Tyler, for help. Although Bruce Tyler did not agree to represent him in the matter as his attorney, he agreed to guide him during the prior action.

Jay Tyler testified that when he brought the claims in the prior action, he believed that because the trust mirrored the provisions in the 1999 will, the plaintiff, who had prepared the trust and was the trustee, had aligned himself with Thomas Tyler, that the plaintiff and Thomas Tyler had conspired to keep facts concerning his mother's estate plan from him, and that the trust itself was "more evidence of undue influence that was taking place." Jay Tyler testified that it was not until 2014 or 2015, during the pendency of the prior action, that he first learned of the existence of the 1988 will, which had been drafted by Bruce Tyler, and learned that the 1988 will had significantly altered his mother's 1984 estate plan, by dividing her estate equally among her five sons, to his detriment. On the basis of his review of the 1988 will, Jay Tyler acknowledged that his mother had changed her mind about her estate plan prior to executing the 1988 will. He also testified that, prior to the time at which he commenced the prior action, Bruce

Tyler had not told him about the 1988 will.

During the trial in the present action, Bruce Tyler testified that he learned about the 1999 will after his mother had died, and that he believed immediately that the 1999 will, on its face, reflected that his mother was "not . . . in her right mind" when she executed the will because "[s]he just wouldn't do that." He explained that the 1999 will was complicated and that its provisions were "vindictive," and that, on the basis of his "lifetime experience" with his mother, he knew her to be a person who "wanted to keep things simple . . . ." He testified that when he compared the 1984 and 1999 wills, "it became quite clear . . . that there was something wrong here; that comparing the two [wills], there's obviously undue influence exercised." Also, Bruce Tyler testified that his review of the 1999 will reflected that Thomas Tyler had played a role in its execution and that this was "also a big red flag that there was undue influence."

Bruce Tyler testified that, following his mother's death, he discussed the 1999 will with his brother, Jay Tyler, and that he told Jay Tyler about the existence of the 1984 will, which he had drafted for his mother. Bruce Tyler testified that he researched legal principles concerning undue influence and, for a variety of reasons, he concluded that he and Jay Tyler had a viable claim that Thomas Tyler had exerted undue influence over their mother with respect to the 1999 will. Specifically, he testified that, following his father's death in 1997, his mother lived alone and was distraught and, thus, was susceptible to undue influence. He testified that his brother, Thomas Tyler, was inclined to exert undue influence because "he thrives on power and influence and takes particular pleasure out of making people miserable. And he does that, and he enjoys it . . . that's his reputation as being some sort of monster." He testified that Thomas Tyler had an opportunity to exert undue influence over his mother because, following his father's death, Thomas Tyler was "omnipresent" in his mother's life and had taken control of her finances. He testified that the 1999 will represented a dramatic change in his mother's estate plan.

Additionally, Bruce Tyler testified that, following his mother's death, he worked closely with Jay Tyler in an attempt to modify the trust so that it did not implement the estate plan reflected in the 1999 will. To this end, he helped Jay Tyler prepare and file the complaint in the prior action. Bruce Tyler testified that, because he was an attorney and Jay Tyler was not an attorney and did not have any training in the law, he also formulated the legal arguments advanced by Jay Tyler in the prior action.

Bruce Tyler testified that it was not until October, 2014, during the pendency of the prior action, that he became aware of his mother's 1988 will.[16] Bruce Tyler

acknowledged, however, that he had prepared the 1988 will for his mother, he was present when she executed the will, and that his signature appeared on the 1988 will. He testified that he had forgotten about the existence of the 1988 will until one of his brothers "got a hold of it" and the will "surfaced with the amended answer to interrogatories" that were submitted by one or more of his brothers during the prior action. Bruce Tyler acknowledged that the 1988 will reflected substantial changes, as compared to the 1984 will, and that the changes made reflected in the 1999 will, as compared to the 1988 will, were not as substantial in nature. Specifically, the 1999 will retained the provision, set forth in the 1988 will, that estate assets would be distributed equally among his mother's five children, but the 1999 will added an explicit requirement that Jay Tyler and Bruce Tyler repay the estate moneys that Ruth Tyler had loaned to them during her lifetime. Nonetheless, Bruce Tyler maintained that this explicit loan repayment requirement was not something that his mother would have wanted to include in her will, and its existence reflected that undue influence had been exerted on her.

The plaintiff testified about the circumstances under which he assisted Ruth Tyler in regard to the trust. He testified that in August, 2004, Thomas Tyler contacted him to let him know that his mother would be in touch with him to set up an appointment to discuss the matter of estate planning. The plaintiff testified that, the next day, Ruth Tyler called him to make an appointment, and he met privately with her later that day at her residence. She told him that she desired to create a trust as a way of preserving her assets, as well as a new power of attorney and a living will. The plaintiff testified that Ruth Tyler told him "that she had a will that she had done; and that the provisions of the will divided her estate equally among her five sons; and that there was a provision in the will that if any of her sons owed her money—and she mentioned Bruce [Tyler] and Jay [Tyler], that they did owe her money—and that money was unpaid at the time of her death, that those sums owed would be deducted from their share."

The plaintiff testified that, later that month, he met with John Tyler, Jr., who had a power of attorney for Ruth Tyler, and that John Tyler, Jr., provided him with a copy of his mother's 1999 will and showed him records concerning loans that his mother had made to Jay Tyler and Bruce Tyler. Subsequently, in September, 2004, the plaintiff drafted the trust and met privately with Ruth Tyler to review its provisions at the assisted living facility where she had resided.[17]

The plaintiff testified that among the provisions that he discussed with Ruth Tyler were those that gave the trustee full authority to manage and control trust assets in whatever form he deemed appropriate without the

requirement that the assets be diversified. The plaintiff also testified that he told Ruth Tyler "that I as the trustee can't be held liable for any losses of the stock that was going to be in the trust or any other asset except in the case of wilful misconduct on my part, so that, in essence, I could keep the assets in the trust; and if the assets in the trust lost value, that I'm not going to be responsible if I maintain what was given to me." He stated that he explained "that the trustee is not liable for any mistake or error or judgment or for any action taken or not taken, either by me or any agent or attorney employed by me, or for any loss of value in the assets, again, except in the case of wilful misconduct." The plaintiff testified that Ruth Tyler did not object to these provisions.

The plaintiff also testified that he explained to Ruth Tyler that trust accountings would be provided to her, as the only income beneficiary of the trust, and to no one else and that she both understood and was content with that provision of the trust.

The plaintiff testified that he provided the unexecuted trust documents that he had prepared to John Tyler, Jr., and that Ruth Tyler executed the trust at her residence in Suffield. The execution of the trust was acknowledged by a third party identified as Jean Sullivan, who was an employee of Thomas Tyler. The plaintiff testified that he was not present when Ruth Tyler executed the trust, but that he executed the trust at a different location.

In his posttrial brief in the present action, the plaintiff argued in relevant part that the exculpation clause of the trust absolved him of any liability with respect to all of the counts of the complaint and cross complaint brought against him in the prior action. The plaintiff argued that because neither defendant had alleged nor proven in the prior action that he had engaged in wilful misconduct, the court, relying on the exculpation clause, should conclude that they brought their claims without probable cause. To the extent that the defendants alleged that he was part of a conspiracy with one or more of their brothers, the plaintiff argued, there were no facts to support such a claim.

In their joint posttrial brief in the present action, the defendants acknowledged that the plaintiff, in his answer to the complaint and cross complaint in the prior action, raised a special defense in which he relied on the exculpatory clause of the trust. The defendants argued, however, that Ruth Tyler had been subjected to undue influence in connection with the trust and, in the prior action, Jay Tyler sought to modify the trust on that ground. Thus, the defendants argued, the plaintiff's reliance on the exculpation clause of the trust, which had been "included in the trust agreement for [the plaintiff's] own protection," was misplaced. The defendants argued that, despite the existence of the exculpation

clause, they brought the complaint and cross complaint with probable cause. Stated otherwise, the defendants argued that they had demonstrated in the prior action that undue influence had been exerted over the settlor of the trust and, therefore, any provisions of the trust that purported to absolve the trustee of liability were unenforceable.

In the present action, although the defendants attempted to prove that the settlor of the trust was in fact unduly influenced and, thus, that the plaintiff was unable to rely on the protections offered him by the trust, the court was not obligated to resolve that precise issue because the question before the court was whether, in the prior action, Jay Tyler had probable cause to claim that the trust should be modified on the ground of undue influence and whether the defendants, relying on this claim of undue influence, had probable cause to bring the claims against the plaintiff.

In its factual findings, the trial court in the present action expressly found that the plaintiff had explained the contents of the trust to Ruth Tyler and that she had agreed to its terms. Moreover, the court discussed Jay Tyler's belief that his mother had been subjected to undue influence. In relevant part, the court stated: "Although defendant Jay Tyler disputed that he owed his mother any money, he was also concerned that his mother's trust essentially disinherited him, which he did not believe she would do, leading him to believe that she had been influenced by Thomas Tyler. Jay Tyler believed that the plaintiff had conspired with Thomas Tyler and that they had unduly influenced Ruth Tyler to 'cheat' him out of his inheritance. Jay Tyler claimed that Thomas Tyler was not a nice person and enjoyed 'putting Jay down,' and [that] the fact that Thomas Tyler was aware of the trust and will was a 'red flag.' "[18] In its decision granting reargument and/or reconsideration, the court addressed Jay Tyler's allegation of a conspiracy as follows: "Jay Tyler alleged that the plaintiff engaged in a conspiracy with his brothers, [John Tyler, Jr.], and Russell Tyler, which wrongfully deprived him of his share of the estate. Despite the plaintiff's assertion to the contrary, the court does not consider these contentions because there are not sufficient factual allegations directed at the plaintiff therein to constitute a separate legal claim against him and, to the extent this claim contains allegations against him, they go to his failure to provide an accounting."

Thus, contrary to the defendants' arguments, there is absolutely no indication that the court "ignored" the evidence of undue influence in connection with the creation of the trust that was presented during the trial or that, in the context of the claims properly before the court, it "failed to consider" the issue of whether the settlor had been subjected to undue influence.[19] Despite the fact that its factual findings do not address the issue

of undue influence expressly, the court plainly found that the settlor was advised of the contents of the trust and was satisfied with them. As we have explained previously in this opinion, the defendants argued that the issue of undue influence was critical to undermining the plaintiff's right to rely on the exculpation provision of the trust to prove that the defendants did not have probable cause to bring the claims against him in the prior action. As the court clearly explained, however, it rejected the plaintiff's argument in this regard. In light of the foregoing, we reject the defendants' claim relating to undue influence.

C

Next, the defendants claim that the court misinterpreted relevant law in its analysis of whether, in the prior action, they had probable cause to claim that the plaintiff had violated § 45a-541c by failing to diversify trust assets. We disagree.

As we previously explained in our discussion of the relevant facts and procedural history, the defendants, in their respective complaint and cross complaint, alleged in the prior action that the plaintiff had failed to diversify trust assets in violation of § 45a-541c. By way of special defense, the plaintiff alleged that the statutory obligations on which the defendants relied had been waived by the settlor of the trust and that the exculpatory provision in the trust shielded him from liability.

As we explained previously in this opinion, in the present action, the court determined that, in the prior action, the defendants lacked probable cause to bring this claim against the plaintiff. The court relied on what it called the "clear and unambiguous" language in § 5 of the trust that relieved the trustee of his duty to diversify trust assets. The court reasoned that, in light of this provision, the defendants lacked probable cause to bring the claim related to the plaintiff's failure to diversify.

The defendants now argue that the court afforded the language in § 5 of the trust an irrefutable presumption of validity and failed to give due regard to their argument that this presumption was refutable by evidence that the settlor of the trust had been subjected to undue influence at the time of the creation of the trust. According to the defendants, "[t]he . . . court's presumption of validity of the exculpatory provision of the trust wrongfully deprived [them] of their ability to negate the plaintiff's special defense to the defendants' claim of lack of diversification . . . ."

Our resolution of the present claim is controlled by our resolution of the claim discussed in part II B of this opinion. The defendants' claim rests on the faulty premise, which we rejected in part II B, that the court failed to consider whether the settlor of the trust was

subjected to undue influence in connection with its creation. In light of our conclusion that the court plainly found that the settlor was advised of the contents of the trust and was satisfied with them, the defendants are unable to prevail in connection with this claim.

### D

Finally, the defendants claim that the court misinterpreted relevant law in its analysis of whether the plaintiff could prevail in the present action merely by demonstrating that the defendants lacked probable cause to bring one of the several claims that they brought against him in the prior action. We disagree.

Previously in this opinion, we set forth the trial court's analysis of whether the defendants had probable cause to bring the claims against the plaintiff in the prior action. In its initial decision, the court reasoned that because the plaintiff had failed to prove that the defendants had acted without probable cause (or with malice) in bringing the claim that the plaintiff had improperly failed to furnish them with trust accountings during the settlor's lifetime, he was unable to prevail with respect to any aspect of his vexatious litigation cause of action. In granting the plaintiff's motion for reargument and/or reconsideration, however, the court first concluded that the plaintiff could prevail in the present action by proving that the defendants lacked probable cause to bring any of the claims against him in the prior action and, second, that the plaintiff was entitled to damages because the defendants lacked probable cause to bring the claim that he improperly failed to diversify trust assets. In ultimately concluding that the plaintiff could prevail in the present action by proving that the defendants lacked probable cause to bring any, but not necessarily all, of the claims against him in the prior action, the court relied on *DeLaurentis* v. *New Haven*, 220 Conn. 225, 597 A.2d 807 (1991), and noted that its rationale applied "especially where the claims [that were raised in the underlying action] are logically severable."

The defendants now argue that the court's reliance on *DeLaurentis* is misplaced because, unlike the claims at issue in that case, the claims that they raised against the plaintiff in the prior action are not logically severable in that they involve the same factual allegations. The defendants argue that the claims merely presented different theories on which to recover damages arising from the same conduct, namely, the plaintiff's failure to diversify trust assets. The plaintiff argues, in reply, that the court properly determined that the claims were logically severable and, thus, the rationale of *DeLaurentis* applied and supported the court's determination that he should prevail, despite the fact that he was unable to demonstrate that the defendants lacked probable cause to bring all of the claims they brought against him in the prior action.

Because the present claim requires us to review the trial court's interpretation and application of the law, we engage in plenary review. See, e.g., *Doe* v. *Dept. of Mental Health & Addiction Services*, 188 Conn. App. 275, 280, 204 A.3d 1230, cert. denied, 332 Conn. 901, 208 A.3d 659 (2019).

*DeLaurentis* governs our resolution of the present claim. In *DeLaurentis*, our Supreme Court observed the well settled rule that, in a vexatious litigation action, a plaintiff must demonstrate that the claims raised in a prior action by the defendant lacked probable cause. *DeLaurentis* v. *New Haven*, supra, 220 Conn. 252. The court addressed the issue of whether a plaintiff must prove that probable cause was lacking for *every* claim raised in the prior action. Id., 253. The court concluded that a plaintiff could prevail in a vexatious suit action by proving that one or more logically severable claims were brought without probable cause. Id., 256. Thus, the fact that a defendant had brought one or more claims with probable cause does not preclude him from being liable for having brought other claims for which probable cause was lacking. The court reasoned: "If a civil plaintiff had probable cause to assert one cause of action but joined to that claim ten others that he knew to be groundless, the victim called upon to defend himself against the ten groundless claims would not suffer less because one good claim was included among them." Id., 253.

In considering the specific claims at issue in *DeLaurentis*, the court determined that probable cause was lacking with respect to certain claims that were logically severable from other claims for which probable cause existed because they contained "factual allegations with respect to different times, occurrences and actions." Id., 255. The court did not define a "cause of action" for purposes of this inquiry as consisting of a single group of facts that gave rise to one or more rights to relief, but stated that each group of logically severable allegations at issue in *DeLaurentis* "amount[ed] to a separate 'charge' to which [the plaintiff] was required to respond." Id., 255 and n.15.

In the present action, the claims alleged to be vexatious in the prior action were as follows: "In the fourth count of the complaint and the first count of the cross complaint, [Jay Tyler and Bruce Tyler] alleged that [the plaintiff] had failed to act as a prudent investor of the trust's assets, in violation of General Statutes § 45a-541b. In the fifth count of the complaint and second count of the cross complaint, both [defendants] alleged that [the plaintiff] had failed to diversify the trust's assets, in violation of General Statutes § 45a-541c. In the sixth count of the complaint and the third count of the cross complaint, [Jay Tyler and Bruce Tyler] alleged that [the plaintiff's] failure to furnish them with trust accountings during their mother's lifetime had pre-

vented them from exercising their right to seek an order from the Probate Court under § 45a-204 compelling [the plaintiff], as trustee, not to keep the trust's assets invested in the same securities received by him. Finally, in the seventh count of the complaint and the fourth count of the cross complaint, [Jay Tyler and Bruce Tyler] alleged that [the plaintiff] had breached his duty to the trust, and to them as trust beneficiaries, by failing to hold the investment advisor liable for losses allegedly resulting from the advisor's advice not to diversify the trust's assets." (Footnotes omitted.) *Tyler* v. *Tyler*, supra, 163 Conn. App. 599–601.

Contrary to the defendants' broad description of these counts as merely representing different theories of recovery on the basis of the same factual allegations, it is readily apparent from a review of the claims that the failure to diversify trust assets claim in the prior action, which the court in the present action found lacked probable cause, was not based on the identical factual allegations as the remaining claims. Specifically, the allegations in each claim related to facts that differed in terms of times, occurrences, and actions. Moreover, each of the claims at issue amounted to separate and distinct "charges" to which the plaintiff was required to respond.

In light of the foregoing, we conclude that the court properly applied the law and properly concluded that the failure to diversify trust assets claim was logically severable from the remaining claims for which probable cause existed.

### III

### PLAINTIFF'S CROSS APPEAL

In his cross appeal, the plaintiff claims that, although the court properly concluded that one of the claims raised against him by Bruce Tyler and Jay Tyler in the prior action and alleged to be vexatious was not supported by probable cause, the court erroneously failed to conclude that Bruce Tyler and Jay Tyler lacked probable cause to bring the remaining claims and that they acted with malice in bringing all of the claims at issue. Accordingly, the plaintiff argues that the court should have concluded that all of the claims at issue were vexatious in nature and, thus, rendered judgment in his favor with respect to these claims. As we have explained previously in this opinion, the court awarded the plaintiff damages after concluding that the defendants lacked probable cause to claim, in the prior action, that the plaintiff had improperly failed to diversify trust assets. The court, however, concluded that the plaintiff was not entitled to recover with respect to the claims, raised in the prior action, wherein the defendants alleged that he failed to act as a prudent investor, that he failed to provide them with trust accountings prior to the settlor's death, and that he

failed to hold the investment advisor liable.

"A vexatious suit is a type of malicious prosecution action, differing principally in that it is based upon a prior civil action, whereas a malicious prosecution suit ordinarily implies a prior criminal complaint. To establish either cause of action, it is necessary to prove want of probable cause, malice and a termination of suit in the plaintiff's favor. . . . Probable cause is the knowledge of facts sufficient to justify a reasonable person in the belief that there are reasonable grounds for prosecuting an action. . . . Malice may be inferred from lack of probable cause. . . . The want of probable cause, however, cannot be inferred from the fact that malice was proven. . . . A statutory action for vexatious litigation under General Statutes § 52-568 . . . differs from a common-law action only in that a finding of malice is not an essential element, but will serve as a basis for higher damages. In either type of action, however, [t]he existence of probable cause is an absolute protection against an action for malicious prosecution, and what facts, and whether particular facts, constitute probable cause is always a question of law. . . . Accordingly, our review is plenary." (Citations omitted; internal quotation marks omitted.) *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, 281 Conn. 84, 94, 912 A.2d 1019 (2007); see also *Lichaj* v. *Sconyers*, 163 Conn. App. 419, 425, 137 A.3d 26 (2016) (plenary review of issue of whether probable cause exists in vexatious litigation action); *Schaeppi* v. *Unifund CCR Partners*, 161 Conn. App. 33, 46, 127 A.3d 304 (same), cert. denied, 320 Conn. 909, 128 A.3d 953 (2015).

Our Supreme Court has explained that "civil probable cause constitutes a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it. . . . Moreover, under our case law, it is well settled that the same standard applies under the common law and [for causes of action brought under the vexatious litigation statute, § 52-568]. [Vexatious suit] is the appellation given in this [s]tate to the cause of action created by statute (General Statutes § 6148 [now § 52-568]) for the malicious prosecution of a civil suit . . . which we have said was governed by the same general principles as the common-law action of malicious prosecution." (Citation omitted; internal quotation marks omitted.) *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, supra, 281 Conn. App. 102–103.

We are mindful that "[p]robable cause may be present even where a suit lacks merit. Favorable termination of the suit often establishes lack of merit, yet the plaintiff in [vexatious litigation] must separately show lack of probable cause. . . . The lower threshold of probable cause allows attorneys and litigants to present issues that are arguably correct, even if it is extremely

unlikely that they will win . . . . Were we to conclude . . . that a claim is unreasonable wherever the law would clearly hold for the other side, we could stifle the willingness of a lawyer to challenge established precedent in an effort to change the law. The vitality of our common law system is dependent upon the freedom of attorneys to pursue novel, although potentially unsuccessful, legal theories." (Citations omitted; emphasis omitted; internal quotation marks omitted.) Id., 103–104.

Because our analysis of whether probable cause existed must be tailored to Bruce Tyler and Jay Tyler, we will address the claim as it relates to each defendant separately.

A

We first address the claim raised by the plaintiff that the court erroneously failed to conclude that, with respect to all of the claims that had been brought against him by Bruce Tyler in the prior action, Bruce Tyler had acted without probable cause and with malice, and had relied on allegations that he knew to be false. Stated otherwise, the plaintiff argues that the court erred by failing to conclude that the cross complaint brought by Bruce Tyler was vexatious in its entirety. We agree, in part, with the plaintiff's claim. We conclude that the court did not properly analyze whether Bruce Tyler had probable cause to bring counts one, three, and four of his cross complaint in the prior action.[20] Accordingly, with respect to the claim of statutory vexatious litigation under § 52-568 (1), we reverse the judgment of the trial court and remand the case to the trial court for further proceedings consistent with this opinion.

In this claim, the plaintiff argues that it was against the weight of the evidence for the court to have failed to find that Bruce Tyler lacked probable cause to bring *any* of the claims that he raised in his cross complaint in the prior action. Specifically, the plaintiff relies on the following facts: (1) Bruce Tyler, who is an attorney, prepared Ruth Tyler's 1984 and 1988 wills; (2) the 1988 will, rather than the 1999 will or the 2004 trust, greatly changed the estate plan reflected in Ruth Tyler's 1984 will by effectively disinheriting Jay Tyler; (3) Bruce Tyler, having drafted the 1984 and 1988 wills, was aware of the fact that Ruth Tyler had not deviated from the estate plan reflected in her 1984 will because she had been subjected to undue influence in connection with the drafting of the 1999 will or the 2004 trust; (4) prior to the commencement of the prior action, Bruce Tyler was familiar with the provisions of the 2004 trust, including but not limited to the provisions that shielded the plaintiff from liability except in the case of his wilful misconduct; (5) Bruce Tyler counselled Jay Tyler with respect to bringing the claims against the plaintiff in the prior action, he drafted Jay Tyler's complaint, he paid certain litigation costs for Jay Tyler, and he there-

after brought the same claims against the plaintiff in his cross complaint; and (6) neither defendant alleged or proved in the prior action that the plaintiff had committed wilful misconduct as trustee of Ruth Tyler's trust.

In arguing that the court improperly failed to conclude that Bruce Tyler's cross complaint was vexatious in its entirety, the plaintiff focuses on the exculpatory clause of the trust. As we explained previously in this opinion, the court essentially determined that, although the exculpatory clause limited the plaintiff's liability, the plaintiff could not rely on the clause in attempting to prove that the defendants lacked probable cause to bring counts four through seven of the complaint and counts one through four of the cross complaint in the prior action.

The plaintiff argues: "As an attorney, Bruce [Tyler] should have known that, to succeed against the plaintiff, the defendants needed some proof that [the] plaintiff's conduct fell outside of the exculpation clause. . . . Here, the settlor made clear her intent to relieve the trustee of the risk of being sued except in cases of wilful misconduct. . . . [T]he issue for the court was whether the defendants (and Bruce [Tyler] in particular, as an attorney) had probable cause to believe [that the] plaintiff could be liable . . . knowing of his reliance on the investment advisor and absent any claim, let alone proof, that the plaintiff was guilty of wilful misconduct." (Citations omitted; internal quotation marks omitted.) The plaintiff argues that "[t]he trial court should have found a lack of probable cause as to all aspects of [the] plaintiff's management of the trust based solely on the fact that . . . there was no allegation or proof of wilful misconduct." Further, the plaintiff argues that the court, in analyzing whether the claims brought against him were vexatious in nature, erroneously concluded that the exculpatory clause was of no significance in its analysis, but merely governed the trustee's ultimate liability. The plaintiff argues that "[t]his interpretation [of the exculpatory clause] would, of course, eviscerate the purpose of the exculpatory clause, which is to protect the trustee, and the trust's assets, from expenses incurred in defending claims where, as here, the trustee acted in good faith."

In its initial decision, the court rejected the plaintiff's reliance on the exculpatory clause in demonstrating a lack of probable cause. The court reasoned that the clause did not prohibit the defendants from bringing an action against the plaintiff, but that the clause merely shielded the plaintiff from liability. In its subsequent decision, the court reiterated its belief that the plaintiff was unable to rely on the exculpatory clause in demonstrating that the defendants brought the prior action without probable cause. The court, relying on, *Jackson* v. *Conland*, 178 Conn. 52, 420 A.2d 898 (1979), correctly

stated that "the exculpatory clause does not act as a complete bar or immunity to civil suit . . . ." The trial court also stated that, although the exculpatory clause could "protect a trustee from personal liability," it nonetheless may not be used "as a sword by the trustee to establish probable cause in a vexatious suit." The trial court essentially disallowed any reliance by the plaintiff on the exculpatory clause in demonstrating a lack of probable cause.

The exculpatory clause provided: "No individual [t]rustee shall be liable for any mistake or error of judgment, or for any action taken or omitted, either by the [t]rustee of by any agent or attorney employed by the [t]rustee, or for any loss or depreciation in the value of the trust, except in the case of willful misconduct." Although we agree that the exculpatory clause did not cloak the plaintiff with immunity from suit, we, unlike the trial court, believe that the clause is highly relevant in an analysis of whether probable cause existed to bring the claims at issue against the plaintiff. This is because it represented a significant hurdle for the defendants to overcome in order to demonstrate that the plaintiff was *liable* for the damages that they sought in the prior action. An analysis of probable cause focuses on whether a party has knowledge of facts sufficient to justify a reasonable person in the belief that there are reasonable grounds *for entertaining an action*. In his cross complaint, Bruce Tyler sought money damages, interest, and such other relief as may be just and proper from the plaintiff. If the exculpatory clause of the trust was enforceable, then it would shield the plaintiff from liability and, therefore, preclude Bruce Tyler from obtaining any of the damages he sought.

Accordingly, we conclude that, in analyzing the issue of probable cause, the court should have considered whether the defendants reasonably believed that they could overcome the exculpatory clause. Stated otherwise, the exculpatory clause of the trust was a highly relevant factor in determining whether "a man of ordinary caution, prudence and judgment" would have entertained the claims at issue against the plaintiff in the prior action. *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, supra, 281 Conn. 102. Although, in *Falls Church Group, Ltd.*, our Supreme Court rejected the claim that a claim for vexatious litigation against an attorney should be judged by a higher standard than the general objective standard, it nonetheless observed that "the *reasonable attorney* is substituted for the reasonable person in [vexatious litigation] actions against attorneys . . . ." (Emphasis added.) Id., 103. The court explained that, with respect to vexatious litigation actions brought against attorneys, the proper probable cause inquiry is whether "a reasonable attorney familiar with Connecticut law would believe" that he or she had probable cause to bring the lawsuit. Id., 105. As this court explained in *Embalmers' Supply*

*Co.* v. *Giannitti*, 103 Conn. App. 20, 35, 929 A.2d 729, cert. denied, 284 Conn. 931, 934 A.2d 246 (2007), the standard that applies to attorneys "is an objective one that is necessarily dependent on what an attorney knew when he or she initiated the lawsuit," and that probable cause may exist even if a suit lacks merit. It is undisputed that, when he filed his cross complaint in the prior action, Bruce Tyler was an attorney and, thus, the court must resolve the issue of whether a reasonable attorney would have believed that he had probable cause to bring the claims in the cross complaint.

As we have discussed previously, in an attempt to overcome the exculpatory clause of the trust, the defendants did not attempt to demonstrate that the plaintiff had engaged in wilful misconduct, but that the settlor had been subjected to undue influence. Bruce Tyler argues before this court that he demonstrated that he had probable cause to bring the claims in that he testified that (1) he knew from reviewing his mother's 1999 will that his mother had been subjected to undue influence, (2) prior to bringing the claims against the plaintiff, he researched the law with respect to undue influence, (3) his mother was susceptible to undue influence "when the 1999 will was prepared," and (4) his brother, Thomas Tyler, who drafted the 1999 will, "had an inclination to exercise undue influence." He articulates the theory that Thomas Tyler exerted undue influence and that the plaintiff "took advantage of the situation by acting when the settlor was being subjected to the undue influence of Thomas [Tyler] by including the self-serving exculpatory language in the trust."

Bruce Tyler's argument rests on the premise that the 1999 will, which was drafted by Thomas Tyler, supports a finding of undue influence in that, when compared with the 1984 will, it significantly reduced what Jay Tyler would inherit from his mother's estate—a result, both defendants strongly maintain, their mother would not have desired. As we have discussed previously in this opinion, however, this premise is faulty because it was the 1988 will, which was drafted by Bruce Tyler, that effectively disinherited Jay Tyler.

Bruce Tyler testified at trial that, although he prepared the 1988 will for his mother, he did not recall the 1988 will until the fall of 2014, after the commencement of the prior action. This was a contested issue of fact. Before this court, he argues that, despite the fact that he drafted the 1988 will and assisted his mother in its execution, he did not conceal the will from his brothers. Rather, Bruce Tyler argues that the 1988 will had been concealed by Thomas Tyler and Russell Tyler, and they presented the will during the protracted litigation between the parties only to gain an advantage against him.

The plaintiff argues that Bruce Tyler, due to his "status as an attorney, his personal knowledge of the rele-

vant facts, his personal and professional relationship with [the settlor of the trust] and his role in bringing this case" knew that his theory of undue influence was unsupported by fact. The plaintiff correctly observes that Bruce Tyler's knowledge of the content of the 1988 will, which he drafted for his mother, significantly undermines his claim of undue influence because the 1988 will, like the 1999 will, also significantly altered the estate plan that is reflected in the 1984 will by significantly reducing Jay Tyler's inheritance.

The plaintiff argues that Bruce Tyler should be charged with the knowledge of the 1988 will "as a matter of law." The plaintiff argues that "[i]t is uncontroverted that Bruce [Tyler], as [his mother's] attorney, at the very least, had the means of knowing, ought to know, or has the duty of knowing the truth about the 1988 will." (Internal quotation marks omitted.) The plaintiff argues that this court should conclude that Bruce Tyler knew about the 1988 will or, at the very least, was wilfully blind and failed to investigate the matter prior to bringing the cross complaint. Thus, the plaintiff argues, Bruce Tyler presumptively knew, despite his allegations, that Ruth Tyler had not been subjected to undue influence in connection with the 1999 will or the trust to effect a change in her 1984 will, because he assisted her in significantly altering her 1984 estate plan in 1988.

As the parties' arguments reflect, the issue of whether Bruce Tyler knew about the 1988 will at the time he brought the cross complaint against the plaintiff in the prior action is an essential inquiry in an analysis of whether he brought the cross complaint with probable cause. The plaintiff correctly observes that the court did not set forth any finding of fact with respect to whether Bruce Tyler testified truthfully that he did not recall the 1988 will *after* it had been disclosed to him during the course of the litigation in the prior action. Instead, in its initial decision, the court observed that the plaintiff had characterized Bruce Tyler's testimony in this regard as untruthful. The court stated: "Although the court found Bruce Tyler's testimony on the issue of the 1988 will *troubling*, this issue is not relevant to the court's ultimate issue in this case, as to whether there was probable cause for the defendants to bring the accounting claim, and whether they had an improper purpose in doing so." (Emphasis added.) Because this factual issue is material to an analysis of probable cause, it must be resolved by the court during the proceedings on remand.

Having concluded that the court improperly failed to give appropriate consideration to the exculpatory clause in its analysis of whether Bruce Tyler had probable cause to bring counts one, three, and four of the cross complaint in the prior action, the appropriate remedy is to reverse the judgment rendered with respect to the statutory vexatious litigation claim under

§ 52-568 (1) as to those counts of the prior action and to remand the case to the trial court for further proceedings consistent with this opinion.[21]

B

Last, we consider the plaintiff's claim that the court improperly concluded that the claims brought against him by Jay Tyler in counts one, two, three, four, six, and seven of the complaint in the prior action were not vexatious. We agree that the court did not properly analyze whether Jay Tyler had probable cause to bring these claims.[22]

In part III A of this opinion, we discussed the plaintiff's claim that, when the court considered the issue of probable cause, it failed to give due consideration to the exculpatory clause of the trust. This claim applies to the common-law and statutory vexatious litigation claims brought by the defendant that were related to counts one, two, three, four, six, and seven of Jay Tyler's complaint against the plaintiff in the prior action. Our conclusion in part III A of this opinion that the court did not properly analyze whether, in light of the exculpatory clause, Bruce Tyler had probable cause to bring counts one, three, and four of the cross complaint, applies to the court's analysis of whether Jay Tyler had probable cause to bring counts one, two, three, four, six, and seven of the complaint. As we have explained previously in this opinion, to overcome the exculpatory clause of the trust, both defendants relied on a theory of undue influence. In analyzing whether the defendants had probable cause to bring the claims at issue against the plaintiff, it was necessary for the court to have considered whether the defendants reasonably believed that they were able to prove that the settlor had been subjected to undue influence.

In part II B of this opinion, we discussed Jay Tyler's testimony concerning the factors that caused him to bring the claims against the plaintiff. It suffices to highlight some key evidence admitted in the present action and observe that, with respect to the complaint brought in the prior action by Jay Tyler against the plaintiff, the evidence reflects that Jay Tyler, who was a self-represented litigant, heavily relied on the expertise of his brother, Bruce Tyler. Bruce Tyler assisted Jay Tyler in preparing the complaint, paid the filing fee, and paid the marshal to serve the complaint. Jay Tyler testified that, although Bruce Tyler did not represent him, he needed legal assistance in pursuing his claims and that either Bruce Tyler or someone employed at his law office helped him prepare legal arguments.[23] According to Jay Tyler, he had been told by Bruce Tyler to be at his "beck and call" during the proceedings and that Bruce Tyler had prepared his legal paperwork.

Jay Tyler testified that Bruce Tyler told him about the 1984 will and the trust. Jay Tyler testified, as well,

that Bruce Tyler told him that the 1984 will should have been in effect at the time of his mother's death. He explained that he named Bruce Tyler as a defendant because he believed that he had to do so because Bruce Tyler was a beneficiary under the trust and that it would not have made any sense for Bruce Tyler to be a plaintiff in an action to enforce the 1984 will, pursuant to which Bruce Tyler would not have received anything from his mother's estate.

Jay Tyler testified that, prior to his mother's death, he did not have any reason to suspect that she had been subjected to undue influence but that, after her death and after learning details of her estate from Bruce Tyler, he came to believe that the plaintiff had conspired with Thomas Tyler to keep the trust and the 1999 will a secret. Essentially, he did not believe that his mother would have effectively disinherited him willingly and believed that Thomas Tyler had the inclination and the means to exert undue influence over his mother. Jay Tyler testified that, although he brought the claims in the prior action in 2010 in an attempt to have the 1984 will reinstated, he did not learn of the existence of the 1988 will until 2014.

Jay Tyler testified: "I felt that I had good reason to bring the actions against [the plaintiff] because by the time I brought the action, I felt that I had proof that he had conspired with my brother Thomas [Tyler] in creating the trust document." He testified that this proof was related to the fact that, following his mother's death, his brothers did not share any information with him about her estate. Then, he learned that Thomas Tyler was untruthful about having filed the 1999 will in Probate Court. Then, he learned from John Tyler, Jr., that a trust had been created and that the plaintiff was the trustee. His suspicions grew, Jay Tyler testified, when he observed that the trust had been acknowledged by a third party whom he knew to be "one of [Thomas] Tyler's employees and political allies."

Jay Tyler testified that his suspicions about undue influence stemmed mostly from the fact that the 1999 will, which was reflected in the trust, was a departure from the 1984 will and, effectively, had disinherited him. He testified, as well, that he believed that his brother, Thomas Tyler, was "not a nice person" and that he would have been inclined to influence his mother to disinherit him.

As we have explained in part III A of this opinion, the issue of whether the defendants acted with probable cause in bringing the claims against the plaintiff in the prior action required the court to determine whether the defendants brought the claims with a bona fide belief that they could overcome the exculpatory clause of the trust by proving that the settlor had been subjected to undue influence in connection with the trust. Thus, the issue of whether Jay Tyler acted with probable

cause in bringing his claims against the plaintiff in the prior action is intertwined with an analysis of whether he had knowledge of facts that would justify a reasonable person in the belief that his mother had been subjected to undue influence. It is not in dispute that Bruce Tyler prepared and helped his mother execute the 1988 will that effectively disinherited Jay Tyler. The evidence suggests that Jay Tyler was unaware of the 1988 will until years after he commenced the prior action against the plaintiff. The evidence also suggests that Jay Tyler believed that his mother had been led by Thomas Tyler to effectively disinherit him by means of the 1999 will, which was reflected in the terms of the 2004 trust.

As we have discussed previously in this opinion, to overcome the exculpatory clause of the trust, it was necessary for the defendants, who did not rely on an allegation of wilful misconduct, to demonstrate that the settlor of the trust had been unduly influenced in connection with the trust. As we observed in part III A of this opinion, it is an unresolved issue of fact whether Bruce Tyler knew about the 1988 will when he brought the cross complaint against the plaintiff in the prior action. As a consequence of the court's failure to give proper consideration to the exculpatory clause of the trust in its analysis of the issue of probable cause, it also failed to find whether Jay Tyler reasonably believed that the settlor had been subjected to undue influence and, thus, had probable cause to pursue the claims at issue. We are persuaded that, with respect to the claims related to the plaintiff's failure to act as a prudent investor, failure to provide trust accountings, and failure to hold the investment advisor liable, the court must determine whether the facts known to Jay Tyler at the time he brought the claims against the plaintiff in the prior action were sufficient as to give rise to a bona fide belief that he should entertain the action against the plaintiff. The fact that the court found, as a matter of fact, that the defendants had not proven that the settlor had been unduly influenced in connection with the trust does not affect our analysis of whether Jay Tyler had a bona fide belief in such facts at the time he commenced the prior action against the plaintiff.

Accordingly, we reverse the judgment rendered in favor of the defendants with respect to the plaintiff's statutory vexatious litigation claim that was brought under § 52-568 (1), in which he alleged, in relevant part, that Bruce Tyler lacked probable cause to bring counts one, three, and four of Bruce Tyler's cross complaint in the prior action, and in which the plaintiff alleged, in relevant part, that Jay Tyler lacked probable cause to bring counts one, two, three, four, six, and seven of the complaint in the prior action. With respect to these aspects of the claim raised under § 52-568 (1), the court is ordered to conduct further proceedings consistent with this opinion.

The judgment in favor of the defendants is reversed in part and the case is remanded for further proceedings in accordance with the preceding paragraph; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] The plaintiff sets forth four distinct claims in his cross appeal but, because they each raise the same legal issue, we will address these claims together.

[2] In a prior appeal, this court more fully described the claims brought against the plaintiff in Jay Tyler's complaint and Bruce Tyler's cross complaint as follows: "In the first count of the complaint, Jay Tyler sought to modify the trust, claiming that Thomas Tyler had exerted undue influence upon Ruth Tyler in relation to the trust and had conspired together with [John Tyler, Jr.], Russell Tyler and [the plaintiff] to keep Ruth Tyler's trust and will a secret from him. In the second count of the complaint, Jay Tyler also sought to modify the trust based upon allegations that the . . . actions [of Thomas Tyler, Russell Tyler, [John Tyler, Jr., and the plaintiff] against him had wrongfully deprived him of his share of the trust estate. In the third count of the complaint, Jay Tyler alleged negligence against [the plaintiff] for failing to furnish him with accountings of the trust while his mother was still alive, and thereby preventing him from discovering the undue influence that had been exerted upon his mother in relation to the trust. In the fourth count of the complaint and the first count of the cross complaint, [Jay Tyler and Bruce Tyler] alleged that [the plaintiff] had [failed to render trust accountings and had] failed to act as a prudent investor of the trust's assets, in violation of General Statutes § 45a-541b. In the fifth count of the complaint and second count of the cross complaint, both [Jay Tyler and Bruce Tyler] alleged that [the plaintiff] had failed to diversify the trust's assets, in violation of General Statutes § 45a-541c. In the sixth count of the complaint and the third count of the cross complaint, [Jay Tyler and Bruce Tyler] alleged that [the plaintiff's] failure to furnish them with trust accountings during their mother's lifetime had prevented them from exercising their right to seek an order from the Probate Court under § 45a-204 compelling [the plaintiff], as trustee, not to keep the trust's assets invested in the same securities received by him. Finally, in the seventh count of the complaint and the fourth count of the cross complaint, [Jay Tyler and Bruce Tyler] alleged that [the plaintiff] had breached his duty to the trust, and to them as trust beneficiaries, by failing to hold the investment advisor liable for losses allegedly resulting from the advisor's advice not to diversify the trust's assets." (Footnotes omitted.) *Tyler* v. *Tyler*, 163 Conn. App. 594, 599–601, 133 A.3d 934 (2016).

[3] On August 22, 2013, the trial court in the prior action, *Sommer, J.*, granted the plaintiff's motion for summary judgment as to all counts of the third amended complaint and the fourth amended cross complaint except for the seventh count of the third amended complaint and the fourth count of the fourth amended cross complaint. Thus, in its initial decision on the motion for summary judgment, the court denied the plaintiff's motion for summary judgment only with respect to the claim that the plaintiff had breached his duty to the trust and the trust beneficiaries by failing to hold the investment adviser liable for losses allegedly resulting from the adviser's advice not to diversify the trust assets. On September 19, 2013, in response to the parties' motions to reargue, the court reversed its prior decision only to the extent that it had granted the plaintiff's motion for summary judgment with respect to the issue of whether the plaintiff owed Jay Tyler and Bruce Tyler a duty to provide them with accountings of the trust prior to their mother's death.

Thereafter, Jay Tyler and Bruce Tyler appealed from the court's judgment. On June 17, 2014, this court dismissed the appeal brought by Jay Tyler and Bruce Tyler with respect to their claim that the trial court improperly had rendered summary judgment on several counts that were asserted against the plaintiff. This court dismissed that portion of the appeal on jurisdictional grounds in light of the fact that, with respect to the claims raised against the plaintiff, the trial court had rendered a partial judgment from which a right to appeal did not exist. *Tyler* v. *Tyler*, 151 Conn. App. 98, 103–104, 93 A.3d 1179 (2014).

The claims brought against the plaintiff on which summary judgment had not been rendered were tried before a jury. On October 24, 2013, a jury

returned a general verdict in the plaintiff's favor. Neither Jay Tyler nor Bruce Tyler appealed from the judgment subsequently rendered by the trial court in the plaintiff's favor.

Following this court's partial dismissal of the prior appeal brought by Jay Tyler and Bruce Tyler from the rendering of summary judgment with respect to some but not all of the claims brought against the plaintiff, and following the jury verdict on October 24, 2013, which resulted in a judgment in the plaintiff's favor with respect to the claims that had not been disposed of by the rendering of summary judgment, Jay Tyler and Bruce Tyler argued during a status conference before the trial court that certain of the claims they had brought against the plaintiff were still pending. On October 1, 2014, the trial court, *Radcliffe, J.*, ruled that *all* of the claims brought against the plaintiff by Jay Tyler and Bruce Tyler had been adjudicated. After Jay Tyler and Bruce Tyler appealed from the trial court's judgment in this regard, this court affirmed the judgment of the trial court. *Tyler* v. *Tyler*, 163 Conn. App. 594, 133 A.3d 934 (2016).

[4] General Statutes § 52-568 provides: "Any person who commences and prosecutes any civil action or complaint against another, in his own name or the name of others, or asserts a defense to any civil action or complaint commenced and prosecuted by another (1) without probable cause, shall pay such other person double damages, or (2) without probable cause, and with a malicious intent unjustly to vex and trouble such other person, shall pay him treble damages."

[5] See footnote 4 of this opinion.

[6] The defendants also brought a counterclaim against the plaintiff in his individual capacity. On October 15, 2014, the court, *Graham, J.*, granted the plaintiff's motion to dismiss the counterclaim. That ruling is not a subject of this appeal.

[7] General Statutes § 52-226a provides: "In any civil action tried to a jury, after the return of a verdict and before judgment has been rendered thereon, or in any civil action tried to the court, not more than fourteen days after judgment has been rendered, the prevailing party may file a written motion requesting the court to make a special finding to be incorporated in the judgment or made a part of the record, as the case may be, that the action or a defense to the action was without merit and not brought or asserted in good faith. Any such finding by the court shall be admissible in any subsequent action brought pursuant to section 52-568."

[8] The motion to dismiss and the court's ruling thereon are discussed in detail in part II A of this opinion.

[9] The court's analysis of "accounting claims" also encompasses the claim raised by Bruce Tyler in count three of his cross complaint.

[10] The court observed: "Unlike [the duty imposed by] § 45a-541c, the duty imposed by § 45a-541b is applicable because the trust does not expand, restrict, eliminate, or otherwise alter it."

[11] See footnote 3 of this opinion.

[12] The defendants observe that § 4 of the trust contained a "penalty" provision that applied to beneficiaries who challenged the trust itself, but that it did not by its terms explicitly authorize the commencement of a vexatious litigation action against one or more beneficiaries.

[13] In their reply brief, the defendants clarify that, in connection with their claim that the plaintiff lacked standing, they do not argue that the plaintiff lacked the authority to commence the present action because he failed to commence the present action within a reasonable time.

[14] The defendants argue that "[t]he [vexatious litigation] cause of action was unnecessary because the trust itself prescribed its own penalty in the event of a vexatious litigation action by one or more beneficiaries." The defendants draw our attention to § 4 of the trust, which provides: "After provision has been made for the payments and reservations specified in [s]ection 3 above, upon the [g]rantor's death, the [t]rust shall terminate and the principal thereof (including any accumulated income) shall be distributed, in substantially equal shares, to the [g]rantor's children, JOHN E. TYLER, JR., BRUCE D. TYLER, THOMAS J. TYLER, RUSSELL J. TYLER and JAY M. TYLER, share and share alike, per stirpes and not per capita, subject to the direction that any sums due and owing to the [g]rantor by her sons, BRUCE D. TYLER and JAY M. TYLER, shall be deducted from any share which they are to receive under the terms of this [p]aragraph 4. *In the event that either BRUCE D. TYLER and JAY M. TYLER dispute, in any way, the terms and provisions of this [p]aragraph 4,* the [g]rantor directs the [t]rustees to deduct from the share that either is to receive under the terms of this [p]aragraph 4, any and all expenses incurred by the [t]rustees

in defending or resolving said dispute, including [a]ttorneys' fees, any and all costs, travel, board and lodging expenses incurred by the [t]rustees, said determination as to expenses shall be made by the [t]rustees in their sole and unlimited discretion. The [t]rustees shall also determine, in their sole and unlimited discretion, the proportionate share of these expenses to be deducted from the share that either BRUCE D. TYLER and/or JAY M. TYLER is to receive from the terms and provisions of this [p]aragraph 4." (Emphasis added.)

As the emphasized language in § 4 reflects, the penalty provision on which the defendants rely pertains to disputes related to the terms and provisions of § 4 of the trust. This provision does not pertain to claims brought by one or more beneficiaries against the plaintiff, as trustee, for damages related to the manner in which he has fulfilled his duties as trustee. Because the claims brought against the plaintiff in the prior action were the subject of the vexatious litigation action, and those claims related to his conduct as trustee, we are not persuaded that § 4 of the trust in any way deprived the plaintiff of his authority to recoup trust assets by commencing the present action against the defendants.

[15] On October 24, 2013, a jury found in favor of the plaintiff with respect to the defendants' claim, advanced in Jay Tyler's complaint and Bruce Tyler's cross complaint, that they were entitled to damages as a result of the plaintiff's failure to hold the investment advisor liable for losses that resulted from following the advisor's advice not to diversify the assets of the trust.

[16] As we stated previously in this opinion, the 1988 will significantly altered the estate plan that was reflected in the 1984 will by requiring an equal distribution of estate assets among Ruth Tyler's five sons.

[17] The plaintiff testified that he did not know why Ruth Tyler was residing in an assisted living facility.

[18] As we have explained previously in this opinion, the court did not agree with the plaintiff's broad reliance on the exculpatory provision in the trust, observing in its original decision that "[t]his 'exculpation' language in the trust does not prohibit the bringing of an action against the trustee, but only that he 'shall not be liable,' except for 'willful conduct.' Indeed, the clause was asserted by the plaintiff in the [prior] action as a special defense." In its decision granting reargument and/or reconsideration, the court stated that "the exculpatory clause may [not] be used as a sword by the trustee to establish probable cause in a vexatious suit."

[19] The record reflects that, after the court rendered its decision on the motion for reargument and/or reconsideration, the defendants filed a motion for articulation in which they asked the court to articulate "[w]hether the court considered the probability of undue influence affecting the settlor's willingness to agree to the exculpatory provisions in the trust." The motion stated: "If [the court did consider the probability of undue influence], explain its rationale for its decision. If it did not consider the probability of undue influence, please state the reason for the said determination of irrelevancy." The court denied this request. The defendants did not seek further review of the trial court's ruling.

[20] Our conclusion does not affect the trial court's determination that Bruce Tyler lacked probable cause to bring the failure to diversify trust assets claim in count two of his cross complaint in the prior action.

[21] In its original memorandum of decision of December 7, 2016, the court found that the plaintiff failed to demonstrate that the defendants had acted with malice in bringing the counts of the complaint and the cross complaint that he alleged to be vexatious. Although, in its original decision in the present action, the court ended its analysis after it concluded that the defendants had probable cause to bring the counts of the complaint and cross complaint based on the plaintiff's failure to provide them with accountings, the court's discussion of whether malice had been proven does not appear to be limited to these specific counts of the complaint and cross complaint. Nor, in our view, is there any logical basis to construe the court's finding with respect to malice as pertaining merely to specific counts of the complaint and cross complaint. The court reasoned that, although there was evidence of animosity between the defendants and their other siblings, the plaintiff failed to prove that the defendants held animosity toward him. The court stated that it did not have any authority pursuant to which it could "transfer the animosity of the defendants from one party to another."

When the court in its memorandum of decision of July 19, 2017 granting reargument and/or reconsideration addressed the counts of the complaint and the cross complaint that were based on the plaintiff's failure to diversify the trust's assets, it expressly "adopted" the finding concerning malice that

it made in its original decision. Thus, in its original memorandum of decision, the court made a finding that the plaintiff had not proven malice and, in its memorandum of decision granting reargument and/or reconsideration, the court reaffirmed this broad finding.

In its memorandum of decision granting reargument and/or reconsideration, however, the court addressed the fifth count of the complaint and the second count of the cross complaint, which were based on the plaintiff's failure to diversify trust assets. It then addressed the remaining claims at issue in the complaint and the cross complaint, which were based on the plaintiff's failure to act as a prudent investor and failure to hold the investment advisor liable, and stated that, in light of its finding that the plaintiff had failed to prove that the defendants had brought these claims in the prior action without probable cause, it was unnecessary for the court to reach the issue of whether the defendants had acted with malice.

Our review of the findings set forth in both decisions leads us to conclude that the court considered the issue of malice and concluded that the plaintiff had failed to prove that the defendants had brought any of their claims at issue in the prior action with malice. The court's finding that malice had not been proven as set forth in the court's original decision and reaffirmed in its memorandum of decision granting reargument and/or reconsideration logically applies to all of the claims at issue that were raised by the defendants in the prior action. Although, in this appeal, the plaintiff argues that the court erred in failing to conclude that the defendants brought their claims in the prior action without probable cause and with malice, he has failed to demonstrate error in the court's finding that malice was not proven.

We clarify that our reversal of the judgment rendered in favor of the defendants pertains solely to the plaintiff's statutory vexatious litigation claim under § 52-568 (1), pursuant to which the plaintiff sought double damages as a result of counts one, two, three, four, six, and seven of the complaint and counts one, three, and four of the cross complaint in the prior action. In part II C of this opinion, we rejected the defendants' challenge to the court's judgment in favor of the plaintiff with respect to count five of the complaint and count two of the cross complaint. We do not reverse the court's judgment in favor of the defendants with respect to count one of the plaintiff's complaint in the present action, in which he brought a claim of common-law vexatious litigation, and count three of the plaintiff's complaint in the present action, in which he stated a claim under § 52-568 (2), pursuant to which the plaintiff would have been entitled to treble damages. To prevail in these causes of action, a plaintiff must prove that a defendant acted with a malicious intent. See *Falls Church Group*, *Ltd.* v. *Tyler*, *Cooper & Alcorn*, *LLP*, supra, 281 Conn. 94 (describing essential elements of common-law claim for vexatious litigation), and footnote 4 of this opinion.

[22] Our conclusion does not affect the trial court's determination that Jay Tyler lacked probable cause to bring the failure to diversify trust assets claim in count five of his complaint in the prior action.

[23] At trial in the present action, Bruce Tyler questioned Jay Tyler. During this examination, Jay Tyler used a written document that showed questions and answers. He testified that Bruce Tyler told him what questions he would ask and that he and Bruce Tyler scripted "appropriate" answers to these questions. Absent objection, the script that Jay Tyler reviewed during his examination was made a full exhibit.